[Civ. No. 17635.   First Dist., Div. One.   June 23, 1958.]

EASTWOOD HOMES, INC. (a Corporation), Respondent, v. K. P. HUDSON et al., Appellants.

534

Carlson, Collins, Gordon & Bold and Fitzgerald, Abbott & Beardsley for Appellants.

Hoey, Hoey, Hall & Conti, Sam W. Hall, Tinning & DeLap and Robert Eshleman for Respondent.

BRAY, J.—Defendants Lafayette Land Company, a partnership, and K. P. Hudson appeal from a judgment in favor of plaintiff in the sum of $20,500.

QUESTIONS PRESENTED

1. Sufficiency of the evidence. This depends primarily upon whether or not plaintiff was guilty of an anticipatory breach.

2. Was the contract void for uncertainty and lack of mutuality?

3. Was the measure of damages incorrect?

1. *Evidence.*

Plaintiff was engaged in the business of constructing and selling houses and was developing a small subdivision in Lafayette. It was interested in the subject property in order to expand its subdivision. Defendant Lafayette Land Company was a partnership in which defendant Hudson was the sole general partner and Shahbazian and Cleverdon were

limited partners. Lafayette Company owned the property and had filed a tentative map of it with the County Planning Commission. Cleverdon Company was in the business of grading, paving and constructing sewer and drainage facilities. The company was owned by Cleverdon, who was president, Shahbazian and Cleverdon's sister-in-law. Grading of the property had been begun by Cleverdon Company and an indebtedness of Lafayette Company to Cleverdon Company therefor in the sum of $4,000 incurred. Lafayette Company had no funds with which to develop the property and was relying therefor on Cleverdon Company and plaintiff, if plaintiff could be interested in the property. On July 1, 1954, plaintiff and Lafayette Company entered into an agreement for the purchase by plaintiff of the property. The terms of the contract important here and as modified by changes made July 19th, follow: Plaintiff agreed to purchase 29 lots as designated on the tentative map above mentioned for $2,800 per lot. Lafayette Company agreed to complete the filing of the map with the county and the California Real Estate Commissioner, and was to level each lot for homesite according to plot plans furnished by plaintiff and as required for F.H.A. and G.I. loans. Grading and certain other work on 17 lots was to be completed by Lafayette Company by September 10th. Plaintiff was to advance to Lafayette Company for sewers, curbs and grading an amount not to exceed $14,000 payable weekly based upon the work accomplished. Plaintiff was to advance monies to cover the cost of installing road pavements, payments likewise to be made weekly based upon the work accomplished, pavement to be completed within 30 days after plaintiff determines the starting date, which must not be later than October 1st. All moneys advanced are to be deducted proportionately from the selling price of the lots "when the house and lot is sold and cleared through escrow." "As each lot and house is sold, the full purchase price $2,750.00, less the proportionate amount of the monies advanced to Lafayette Land Company and EBMUD, will be paid to Lafayette Land Company *out of escrow*." (Emphasis added.)[1] Plaintiff paid Lafayette $500 on the execution of the contract and was to pay it $1,500 five days thereafter, "at which time Lafayette Land Company will issue instruc-

[1] The lot price was originally $2,750. It was changed to $2,800 on the first page of the agreement, and inadvertently not changed in the above clause.

tions to the Title Company to deed seventeen (17) lots" to plaintiff, "post bond with Contra Costa County and start grading on the seventeen lots." Plaintiff agreed to purchase the remaining 12 lots within 24 months.

Plaintiff's secretary-treasurer, Monson, represented plaintiff in the transaction. He was informed that the tentative map had been presented to the planning commission and that the final map was ready for filing. After the contract was executed, he frequently informed Lafayette Company of the necessity of filing the final map, since plaintiff could not go through the requisites of building on the subdivision until the map was filed. Plaintiff paid the $1,500 required by the contract. In July Monson saw that Cleverdon Company was grading on the property. He objected to its being done until the map was filed. Defendant Hudson promised to have the map filed as fast as possible.

Toward the end of July, Cleverdon Company needed money to meet its payroll. Cleverdon and defendant Hudson told one Koepke, bookkeeper for Cleverdon Company, to get $4,000 from plaintiff. Koepke advised Monson of the necessity for this money. Monson asked where the map was. Koepke said they were working on it and unless Cleverdon got some financial help work would have to stop and plaintiff would never get the map. Monson told Koepke to stop the work. Actually, at this time, while Lafayette Company owed Cleverdon approximately $4,000, only $2,000 of the indebtedness was due for work on the subject property. Monson then notified Hudson that plaintiff did not feel safe in paying for grading work until the map was filed and asked Hudson to give a deed of trust on the property. Hudson refused. However, plaintiff paid the $4,000 when a deed of trust arrangement on adjacent property owned by Cleverdon and Shahbazian was made, which deed of trust was to be reconveyed upon Lafayette's crediting the $4,000 and the $1,500 on plaintiff's agreement. When plaintiff paid the $4,000 he again asked that the map be recorded.

Cleverdon continued work on the property. Plaintiff was not asked for more money. The final map was approved by the board of supervisors November 3rd and recorded November 5th. At that time the title company man who had worked out the deed of trust arrangement, prepared, on his own initiative, a holding agreement which he sent to the parties. It provided that Lafayette would transfer title to the title company and then the property could be conveyed

to plaintiff for the purpose of obtaining construction loans, and then reconveyed to the title company. Then when $2,775 per lot was received by the title company the lot would be reconveyed to plaintiff's order. Plaintiff had nothing to do with the insertion of $2,775 instead of the agreed price of $2,800 in the holding agreement. Nor did it expect to pay less than $2,800. Monson on receiving the agreement brought it to the title company man for explanation and then signed it. Hudson refused to sign although he testified that he might have offered to sign it under his own instructions. In November a conference was had between plaintiff and defendants (except Cleverdon). The parties disagree as to what was said at this conference. Plaintiff contends it was called to meet the situation caused by the exceedingly poor work being done by Cleverdon Company and that all that was discussed was the elimination of Cleverdon Company and the suggestion that plaintiff do the work itself deducting the cost from the purchase price. The proposed holding agreement was not discussed nor was any suggestion made that plaintiff was in default. Defendants claim that they objected to the proposed holding agreement, both because of the mention therein of $2,775 per lot instead of $2,800, and of the provision to the effect that plaintiff was to obtain a building loan on the property before paying for the lots.

The main difference between the parties is whether the agreement contemplated that the title to the property should be deeded to plaintiff so that it could obtain a construction loan on it. Plaintiff did not default. Under the contract it paid $2,000 and advanced $4,000. Its further advances were only to be made "weekly based upon the work accomplished." At the time it advanced $4,000 the work accomplished came to approximately $2,000 only. At no time thereafter was it presented with estimates of the work accomplished nor a demand made for any further advances. As to the mention of $2,775 as the lot price in the proposed holding agreement, the evidence supports the conclusion that this was the error of the title company man and that at no time was plaintiff claiming that as the purchase price.

The court found, in effect, that plaintiff's version that it was intended that the plaintiff be allowed to borrow on the property for the moneys with which to construct the contemplated homes, that the title be held by the title company subject to such loan, and then to be deeded lot by lot to plaintiff's order upon receipt of the $2,800 less moneys advanced

by plaintiff, said sum to come from the sale of each lot and house, was the correct one. The court further found that plaintiff performed its portion of the contract and made no anticipatory breach and that defendants breached the contract by refusing to deed the property to plaintiff. While the evidence was in conflict, the court resolved, as it had the right to do, that conflict in favor of plaintiff. The evidence substantially supports the findings.

Defendants discuss at some length their contention that subjecting the property to a construction loan would have deprived them of a vendor's lien as a first lien upon the property. While this is true, the evidence shows that the parties so intended it. Moreover, even upon defendants' theory that there was to be no construction loan their vendor's lien would have been subject to mechanics' liens arising from the construction of houses upon the property. Any discussion of vendor's lien is out of place under the circumstances of this case. Under the theory of both parties the title company was to hold the title and not convey it to plaintiff until the purchase price was paid, the only difference being that under plaintiff's theory the title was to be subject to a lien for the construction money. Either way the title company would be holding the title in trust for Lafayette Company until the purchase price was paid and hence there could be no vendor's lien. A vendor's lien does not arise until the seller transfers the legal title to the vendee. (*Maltby* v. *Conklin* (1920), 50 Cal.App. 201, 204 [195 P. 280].)

Defendants cite authorities on anticipatory breach of a contract. They are not in point for the reason that the evidence here supports a finding that there was no such breach and that defendants did not treat the presentment of the proposed holding agreement as a repudiation by plaintiff but still considered the contract in effect. Under plaintiff's evidence, found to be true by the trial court, the November conference was for the purpose of proceeding under the contract with the substitution of plaintiff as the one to do the grading work instead of defendants. Such evidence is also susceptible of the finding that plaintiff was always willing to perform and pay the $2,800 per lot, and that the holding agreement was not its but that of the title company man which, although signed by plaintiff after it was explained to Monson, was not insisted upon by plaintiff. It is significant that although defendants concede that there was to be a holding agreement they at no time suggested that the proposed one be modified in accord-

ance with their claim as to what was intended to be in it. Plaintiff at no time unequivocally stated that the holding agreement must be in the form proposed by the title company man. ■ For there to be a repudiation of the original contract, such repudiation must be unequivocal. (See 12 Cal. Jur.2d § 248, p. 475.) ■ Repudiation is a question of intent to be determined ordinarily as a fact. (*Nemanick* v. *Christensen* (1948), 87 Cal.App.2d 844, 846 [197 P.2d 785].)

2. *Was the Contract Void for Uncertainty and Lack of Mutuality?*

No. The contract is by no means a model. However, reading the agreement in the light of the circumstances, it is clear what the agreement provided. Plaintiff was a subdivider. It needed land adjoining its subdivision for further subdividing. Defendants owned such land and wanted to dispose of it. Probably because Cleverdon, one of defendants' special partners, was engaged in the grading business, defendants proposed to do the necessary grading, sewering, etc., for a subdivision before turning the property over to a purchaser. Both parties knew that the property was to be deeded to the title company "in escrow" and that plaintiff was to pay for the property only after it had constructed homes thereon and sold them, the lot purchase price to come out of the sale price of both house and lot. While the contract does not expressly state that the moneys for house construction would come from a construction loan it necessarily was implied therein. The contract provides that the property is to be paid for at $2,800 per lot, less proportionately the moneys advanced by plaintiff for grading, etc., such amount to be paid to defendant "out of escrow" "[a]s each *lot and house* is sold." (Emphasis added.) It is obvious that under modern subdivision practices plaintiff could not construct houses without getting a construction loan on the property and to place the property in condition for that purpose, Lafayette "will issue instructions to the Title Company to deed seventeen (17) lots of Unit No. 2."[2]

Defendants concede that the contract implied a "holding agreement" was to be executed by the parties with the title company. They do not concede, however, that it was to provide for a construction loan.

---

[2]The other 12 lots (Unit 3) were to be treated within 24 months on the same terms and conditions as the 17 lots.

■ The first provision attacked as uncertain is that in which, after plaintiff pays $1,500 five days after the execution of the agreement, Lafayette "will issue instructions to the Title Company to deed seventeen (17) lots" to plaintiff, post bond and start grading. The uncertainty allegedly exists in the failure to specify what "instructions" are to be given. However, the provision is certain enough to bind defendants for an obligation to convey. This they refused to do, and the evidence supports a finding that they refused to convey not because of the lack of instructions but allegedly for late payments by plaintiff. The provision is certain enough for an action for damages for failure to convey although that might not be the case if plaintiff were seeking specific performance of the contract. It has been stated that a greater amount of certainty is required in the terms of an agreement which is to be specifically enforced in equity than is necessary in an action for damages at law; that an action at law is founded upon a mere nonperformance by a defendant, and *this negative conclusion can often be established without determining all the terms of the agreement with exactness*; whereas in equity the mere fact of nonperformance is not enough since its object is to procure performance, which object demands a clear, definite and precise understanding of all the terms before the performance can be enforced. (*Pascoe* v. *Morrison* (1933), 219 Cal. 54, 58 [25 P.2d 9] ; *Stanton* v. *Singleton* (1899), 126 Cal. 657, 664 [59 P. 146, 47 L.R.A. 334].)

■ Defendants contend that the contract lacks mutuality because, say they, there is no time limit fixed for payment, the price is not to be paid absolutely and in all events but only "out of escrow" and "[a]s each lot and house is sold" and there is no promise by plaintiff to build any houses, nor is the type of house or its cost expressed.

*Clarey* v. *Security Portland C. Co., Inc.* (1929), 99 Cal.App. 783, 786-787 [279 P. 483], states, quoting from Williston: " 'It is often stated as if it were a requisite in the formation of contracts that there must be mutuality. This form of statement is likely to cause confusion, and, however limited, is at best an unnecessary way of stating that there must be a valid consideration. In unilateral contracts there is never mutuality of obligation; and in bilateral agreements, though it is necessary that there shall be such a promise on each side as will furnish valid consideration, to express the idea by saying that mutuality is necessary is sure to cause confusion with the use of the same word by courts of equity. . . . The particular

error which is traceable to the misleading use of the word as a requirement for the formation of a contract is a tendency observable in some of the cases to hold a contract invalid because the obligation undertaken on one side is not commensurate with that undertaken on the other. . . .' ''

A proper interpretation of the contract would make it reasonable to imply that plaintiff, by agreeing to pay from a certain fund, obligated itself to do those acts which would bring the fund into existence.

It is said in section 1643, Civil Code, that a contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties. And "All things that in law or usage are considered as incidental to a contract, or as necessary to carry it into effect, are implied therefrom. . . ." (Civ. Code, § 1656.) Under these sections courts are not empowered under the guise of construction to depart from the plain meaning of the contract and insert a term or limitation not found therein, but implied covenants are justified when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed. (*Tanner* v. *Title Ins. & Trust Co.* (1942), 20 Cal.2d 814, 824 [129 P.2d 383].) And it has also been said that "Each party to a contract has a duty to do everything that the contract presupposes that he will do to accomplish its purpose." (*Bewick* v. *Mecham* (1945), 26 Cal. 2d 92, 99 [156 P.2d 757, 157 A.L.R. 1277].) Taking the contract in the instant case as a whole, it involved more than just the transfer of title for a price. It also contemplated the full development of the subdivision. Defendants had subdivided it and had promised to do the grading and sewer work for plaintiff and plaintiff was to build on the lots and sell them using the proceeds to complete the payment of the full price. Therefore in order that the contract could be completely performed it was necessary that plaintiff build houses on the lots and sell them in that improved condition.

It cannot be disputed that the plaintiff was obliged to pay $2,800 per lot but the promise to pay the balance was out of a fund to be realized a certain way. In such cases there is an implied obligation to use reasonable diligence in performing the act upon which payment was contingent, and in default of due diligence, payment becomes due without performance of the condition. (*Van Buskirk* v. *Kuhns* (1913),

164 Cal. 472 [129 P. 587, Ann.Cas. 1914B 932, 44 L.R.A.N.S. 710] and cases cited at p. 475; see also 12 Cal.Jur.2d, pp. 372-374.) Those cases are not squarely in point but seem to be analogous. They involve a situation where a debtor promises to make payment out of a fund to be realized in a certain specified manner. In those cases the promisees were seeking to recover on the debts before the funds were realized, and it was held that they could do so since the promisors had not used due diligence. Therefore here, if plaintiff, after receiving a conveyance of the lots, had not used due diligence in building houses on the lots and selling the improved lots, then the defendants would have been able to seek damages from plaintiff for failure to pay as promised.

We are not, as defendants contend, dealing with a modification of the contract sued upon in the complaint. We are interpreting the original contract (as amended on its face) in the light of the understanding of the parties as shown by the evidence found true by the trial court. Hence authorities to the effect that modification of a contract must be pleaded are not in point.

### 3. *Damages.*

Defendants contend that the measure of damages used by the trial court was incorrect. It awarded plaintiff the $6,000 paid by plaintiff plus $14,500 which it found was the difference between the price agreed to be paid in said agreement for the property, and the value of the property at the time of defendants' refusal to convey.

Section 3306, Civil Code, provides: "The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, with interest thereon; but adding thereto, in case of bad faith, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed, at the time of the breach . . ."

Plaintiff's right to the $14,500 assessed by the trial court depends upon whether the evidence supports the implied finding of bad faith. We think it does. Defendants contend that they could not have conveyed the property prior to the time when in November the final map was recorded because of sections 11538 and 11541 of the Business and Professions Code which make it unlawful for a vendor to sell any subdivision until a final map is recorded, and hence there could have been

no bad faith up to that time. While the evidence indicates that defendants were dilatory and should have succeeded in getting the map filed much earlier than they did, it may be assumed that there was no bad faith shown prior to the filing of the map. Defendants sought to excuse their failure to perform the contract thereafter upon three grounds: (1) that the parties were joint adventurers (the court expressly found that they were not, and the evidence amply supports such finding) ; (2) that plaintiff itself breached the contract and that defendants did not (again the court found to the contrary and the finding is well supported) ; (3) that the contract is void for uncertainty and lack of mutuality. As we have heretofore shown, it is not. The evidence indicates that defendants made no complaint of any alleged default by plaintiff nor did they ever offer to perform or deed the property according to their own view of the contract, although it bound them to deed 17 lots to plaintiff. Thus defendants have offered no sustainable excuse for their failure to perform.

The test of bad faith is merely whether the party deliberately or without just cause or excuse refused to perform the contract. See *Nelson* v. *Fernando Nelson & Sons* (1936), 5 Cal.2d 511, 518 [55 P.2d 859] ; *Johnson* v. *Goldberg* (1955), 130 Cal.App.2d 571, 578 [279 P.2d 131] holding also that "The question of bad faith is a factual one"; *Pixley* v. *First Federal Sav. & Loan Assn.* (1952), 110 Cal.App.2d 427, 432 [243 P.2d 100].

Defendants offered no excuse for refusing to perform the contract other than those hereinbefore mentioned, all of which have been shown to be not well founded. Thus, the evidence sufficiently supports the finding that they refused to convey without just cause or excuse.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied July 23, 1958, and appellants' petition for a hearing by the Supreme Court was denied August 21, 1958.