**In the Matter of Ocean Air Tradeways, Inc., Bankrupt No. 90989.**

**OCEAN AIR TRADEWAYS, INC., Appellant,**

**v.**

**ARKAY REALTY CORP. and Duncan, Korb & Trimble, Inc., Appellees.**

**No. 26451.**

United States Court of Appeals, Ninth Circuit.

June 19, 1973.

Rehearing Denied July 19, 1973.

Joseph Yovino-Young, Oakland, Cal. (argued), Hyman R. Freidman, New York City, for appellant.

Richard C. Lewis, Oakland, Cal. (argued), of Gilmore & Lewis, Oakland, Cal., for appellees.

## OPINION

Before ELY and CARTER, Circuit Judges, and FERGUSON,* District Judge.

JAMES M. CARTER, Circuit Judge:

This is an appeal from an order of the district court, affirming, without opinion, the order, findings and conclusions of the referee in bankruptcy. The referee allowed two claims in bankruptcy: (1) Arkay Realty Corp. (hereafter Arkay) claimed $150,517.00 for breach of a contract to buy real property from the bankrupt, Ocean Air Tradeways, Inc. (hereafter Ocean Air); and (2) Duncan, Korb & Trimble, Inc. (hereafter DKT), a licensed real estate broker, claimed broker's fees in the same transaction of $17,500.00, plus interest. We affirm.[1]

### Facts

Ocean Air owned certain real property in San Leandro, California, including a building occupied by Airpower Overhaul, Inc. (hereafter Overhaul). Overhaul maintained airplanes for United States Overseas Airlines, Inc. (hereafter Airlines) and others.

Airlines owned all the stock of Overhaul. In turn, 75.5 percent of Airlines, and 70 percent of Ocean Air, were owned by Ralph Cox, Jr. The remaining stock of each was owned by members of Cox's family. Cox was a director of all three corporations, the president of Ocean Air and of Airlines, and the vice president of Overhaul. The referee found that Cox "unilaterally directed and controlled" all three corporations, and did business without the usual corporate formalities.

The corporations had borrowed money from Walter Heller & Company, Inc. (hereafter Heller), in return for which all of Airlines' stock in Overhaul, and all of Cox's stock in Ocean Air and Airlines, was pledged as security. Heller also had a deed of trust on Ocean Air's San Leandro property.

In late 1965, Heller was pressing for payment of the loan. Cox and one Steward Carter, Jr., an attorney, agreed that Carter would receive half of Airlines' stock in return for seeking reinstatement of Airlines' operating certificate, suspended in 1964 for insufficient capitalization, and for helping to obtain new financing. Michael Bennett, an employee of Carter's, began negotiations with Heller to stave off an impending

---

* Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

1. The case was argued and submitted on May 11, 1972. It has been a trouble- some one for the panel. Because of conflicting views, we have been unable earlier to arrive at a decision. The case was assigned to the writer on May 23, 1973.

foreclosure sale of the San Leandro property. Bennett was told that the sale would be postponed if a buyer for the property could be found.

Bennett met with DKT to find a purchaser, and DKT located Arkay. On February 8, 1966, the parties executed a contract, denominated a "Deposit Receipt," under which Arkay was to pay Ocean Air $367,000, in a somewhat complex transaction. For purposes of this opinion we need not detail these matters, which involved a 20-year lease of the property by Overhaul, an assignment to Arkay of part of Overhaul's rents from Airlines, and an option to Arkay on one-third of Overhaul's stock. Ocean Air was to cause Overhaul to execute the lease. Under terms of the contract, Carter and Bennett agreed in writing to guarantee Overhaul's performance. They were to receive all of the Overhaul stock from Airlines, allegedly in return for $200,000. Ocean Air expressly agreed to deliver marketable title to the San Leandro property, free of certain encumbrances, including the Heller trust deed. Closing was to occur on or before March 10, 1966, which coincided with Heller's date for the foreclosure sale.

The referee found that Ocean Air "never intended to perform the contract when Cox executed it, or at any time thereafter." In essence, Cox was merely buying time to forestall the Heller foreclosure proceedings. The referee found that

> "On March 8, 1966, the bankrupt [Ocean Air], without adequate reason or excuse, repudiated the contract by informing [DKT and Arkay] that the bankrupt would not perform under the contract. It was not impossible for the bankrupt to perform under the contract. The bankrupt breached the contract wilfully and in bad faith."

Arkay had deposited $10,000 with DKT, to be later placed in the escrow. DKT returned Arkay's deposit about two weeks after Ocean Air's breach. The deposit had been held in DKT's trust account; nothing had ever entered escrow. The referee further found that Arkay and DKT had fully performed insofar as Ocean Air and Cox had not, by their breach, excused such performance.

### Return of Arkay's Deposit

Ocean Air contends that when DKT returned Arkay's deposit, after the time for performance had passed, Arkay could not thereafter recover damages for Ocean Air's breach. DKT never placed the deposit into escrow, because Cox failed to attend meetings scheduled for finalization of escrow instructions. The deposit was held by DKT as evidence of good faith, and apparently was returned on DKT's initiative. We cannot imply a demand and election of remedies in such a situation, as Ocean Air would have us do.

■ The measure of damages for breach of an agreement to convey real estate is the price paid, "but adding thereto, in the case of bad faith, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed, at the time of the breach. . . ." Cal.Civ.Code § 3306 (1954). The vendee is "entitled to the return of the principal paid," Engasser v. Jones, 88 Cal.App.2d 171, 176, 198 P.2d 546, 549 (1948); and interest thereon, Rasmussen v. Moe, 138 Cal.App.2d 499, 504, 292 P.2d 226 (1956). Where the seller breaches in bad faith, as Ocean Air did here, the buyer is entitled to damages for the loss of his bargain *plus* payments and advances under the contract. Eastwood Homes, Inc. v. Hudson, 161 Cal.App.2d 532, 327 P.2d 29 (1958); Dempsey v. Stauffer (3 Cir. 1962), 312 F.2d 360, 363–364. A non-breaching buyer, such as Arkay here, may withdraw his deposit and still sue for damages arising from the seller's breach. Jeppi v. Brockman Holding Co., 34 Cal. 2d 11, 18, 206 P.2d 847 851 (1949); Johnson v. Goldberg, 130 Cal.App.2d 571, 279 P.2d 131 (1955).

When Ocean Air Repudiated the contract on March 8, 1966, a cause of action for breach thereof arose. Under Cali-

fornia law, it is clear that Ocean Air anticipatorily repudiated the contract, and that Arkay was thereafter excused from any further performance thereunder.

"A contract is totally breached and an anticipatory repudiation occurs when the promisor without justification and before he has committed a breach, makes a positive statement to the promisee indicating that he will not or cannot substantially perform his contractual duties." Gold Mining & Water Co. v. Swinerton, 23 Cal.2d 19, 29, 142 P.2d 22, 27 (1943).

"If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party." Calif.Civ.Code § 1440 (1954).

■ Refusal by the vendor to perform, excuses formal tender of the purchase price by the purchaser. Hunt v. Mahoney, 82 Cal.App.2d 540, 549, 187 P.2d 43 (1947). "Performance by the party not in fault is always excused by the wrongful refusal to perform by the other party." Central Oil Co. v. Southern Ref. Co., 154 Cal. 165, 167, 97 P. 177 (1908).

■ Thus, Ocean Air's repudiation excused Arkay from tendering the purchase price and from maintaining or increasing any monies advanced toward it, in escrow or otherwise.

■ Ocean Air also urges that a provision in the contract concerning its obligation to furnish marketable title,[2] established the return of the deposit as Arkay's exclusive remedy. There is no merit to this contention. The provision concerned only quality of title, not its very existence, and not whether Ocean

2. The contract reads:
"9. Title is to be free of liens and encumbrances other than those set forth herein. Evidence of title shall be a California Land Title Association standard coverage form policy of title insurance issued through Western Title Insurance and Guaranty Company to be paid for by seller [Ocean Air]. If seller is unable to convey a marketable title, except as herein provided, within one month after acceptance hereof by seller, or if the improvements on said property be destroyed or materially damaged prior to transfer of title, then, upon demand of buyer [Arkay], said deposit and all other sums paid by buyer shall be returned to buyer, and this agreement as between buyer and seller shall be of no further effect, and seller thereupon shall become obligated to pay all expenses incurred in connection with examination of title."
The first sentence establishes that Section 9 concerns freeing title of liens and encumbrances. The second sentence prescribes a form for evidence of title. The third and last sentence, upon which Ocean Air would rely, describes what is to occur in the event that "seller is unable to convey a marketable title. . . ." The third sentence does *not*

say, in effect, "if seller is unable to convey title." If that were the language, then the seller's inability to convey, in terms of economic "impossibility," would perhaps be material. But such is not the case. The sentence concerns only the capability of seller to convey something that is well-defined in law, "*a marketable title*," meaning a title which is free of certain defects and no other sort of title. *See* note 3 *infra*. It concerns only *marketability*, not all aspects of title such as whether seller is financially able to acquire any title whatsoever. In the context of the first two sentences concerning encumbrances and evidence of title, any other interpretation is beyond reason.
It is apparent from a full reading of the section that the words "upon demand of buyer" modify all three clauses that follow. After the words "upon demand of buyer" appears the provision for return of the deposit, and then a comma. The section must be read so that the material following the comma, to wit, "and this agreement . . . shall be of no further effect," is predicated by the words "upon demand of buyer." Therefore, Section 9 does *not* say, "and upon the return of the funds to the buyer the agreement shall be of no further effect."

Air was *able* to acquire title or to remove clouds upon it.[3]

Therefore, under California law Arkay was entitled *both* to return of the deposit and to damages for Ocean Air's breach. Arkay would have been so entitled even if the $10,000 had been on deposit in escrow, rather than in DKT's trust account. Return of the deposit was not an exclusive remedy, as Ocean Air contends.

### Failure to Buy Overhaul Stock

■ Ocean Air next urges that its performance was excused by reason of Carter's and Bennett's failure to perform their supposed guarantee to pay Ocean Air $200,000 for its stock in Overhaul, as a condition precedent to Ocean Air's performance.

There are three problems with this theory. First, if there did exist an obligation by Carter and Bennett to pay $200,000 for the Overhaul stock, that agreement was not proved below. No writing to that effect was introduced. If such an agreement existed, Cox could easily have protected himself by expressly requiring such payment as a condition precedent to the Arkay transaction.

Second, Cox controlled all three corporations. To the extent that any of them or their or his employees, failed to perform, he could have prevented that failure.

■ Moreover nothing prevents one party from contracting that he will obtain the performance of a third party. When a party so contracts, the rule is as stated in Restatement, Contracts, § 455 (1932):

"Impossibility of performing a promise that is not due to the nature of the performance, but wholly to the inability of the individual promisor, neither prevents the formation of a contract nor discharges a duty created by a contract."

*See also id.*, Comment a and Illus. 6; 6 Corbin, Contracts §§ 1332–33 (1962). The California courts follow this rule. Klauber v. San Diego Street-Car Co., 95 Cal. 353, 357–358, 30 P. 555 (1892); McCulloch v. Liguori, 88 Cal.App.2d 366, 370, 199 P.2d 25 (1948). See also B's Co., Inc. v. B. P. Barber & Assoc., Inc. (4 Cir. 1968), 391 F.2d 130, 137.

■ Third, the referee specifically found that it was not impossible for Ocean Air to perform. The burden of proving such a defense was on Ocean Air. See Abrams v. Motter, 3 Cal.App. 3d 828, 839, 83 Cal.Rptr. 855 (1970). The party advancing the defense must prove that the events which he claims frustrated his performance were not reasonably foreseeable at the time of contracting. Gold v. Salem Lutheran Home Ass'n of the Bay Cities, 53 Cal.2d 289, 291, 1 Cal. Rptr. 343, 347 P.2d 687 (1959); Glenn R. Sewell Sheet Metal, Inc. v. Loverde, 70 Cal.2d 666, 676 & n. 13, 75 Cal.Rptr. 889, 451 P.2d 721 (1969).[4]

3. "Marketable title" is a term of art in real property law.
"'[M]arketable title,' to which the vendee . . . is entitled, means a title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear on such transactions, be willing and ought to accept." Staton v. Buster, 79 Cal. App. 428, 432, 249 P. 878, 880 (1926) (quoting); George v. Colvin, 98 Cal. App.2d 57, 62, 219 P.2d 64 (1950); Hocking v. Title Ins. & Trust Co., 37 Cal.2d 644, 649, 234 P.2d 625 (1951).

4. Appellant's brief lumps together the doctrines of impossibility, impracticability, and frustration of contract purpose. We have discussed impossibility in the text. This is not a proper case in which to apply the doctrine of frustration, wherein performance remains possible but its expected value to one of the parties has been destroyed by an *intervening* and *fortuitous* event. *See* Gold v. Salem Lutheran Home Ass'n of the Bay Cities, 53 Cal.2d 289, 1 Cal.Rptr. 343, 347 P.2d 687 (1959); Lloyd v. Murphy, 25 Cal. 2d 48, 153 P.2d 47 (1944). Nor is it claimed that one party acted to prevent the performance of another, as appears in Carlson v. Sheehan, 157 Cal. 692, 109

Therefore, in this case, Ocean Air's own inability to perform, even it it were assumed contrary to the referee's findings, would not have excused Ocean Air's performance.

### The Referee's Findings of Bad Faith

■ Ocean Air contends that there was insufficient evidence to support the referee's finding that its breach was willful and in bad faith. The short answer is that the finding is amply supported by such evidence as Cox's unexcused failure to attend meetings scheduled to finalize escrow; his attempt to sell the San Leandro property to third parties after he had signed the Arkay contract; and evidence that he felt that the Arkay contract was "meaningless and all it is is buying time; cannot be performed; it didn't mean anything."

Ocean Air also argues that the failure of Carter and Bennett to perform removed any causative nexus between Cox's original intent not to perform, and Ocean Air's breach. We have dealt with Carter's and Bennett's nonperformance above; to attempt to so apply it here borders on the frivolous.

### Arkay's Ability to Perform

■ The next claim of Ocean Air is that Arkay did not adequately prove that it was able to perform up to and at the time of Ocean Air's anticipatory breach. We have reviewed the record, and we believe it amply supports the referee's findings that Arkay was at all material times ready and able to perform.

### DKT's Brokerage Commission

■ Ocean Air's final contention is that DKT was not entitled to its brokerage commission under the contract be-

cause of alleged impossibility of Ocean Air's performance, with which we have dealt, *supra*, and because DKT's return of Arkay's deposit was allegedly in derogation of DKT's fiduciary duty as broker to Ocean Air. This contention is also without merit.

The $10,000 deposit was not paid by Arkay to or for the account of Ocean Air as part performance under the deposit receipt. Arkay deposited it with DKT, with the intention that DKT would deposit it in escrow on Arkay's behalf, and that Ocean Air would have no right to the deposit unless it fully performed or Arkay breached the contract. When Ocean Air repudiated the contract, DKT, as agent with respect to the deposit, had no reason to retain the funds beyond the time for performance. Return of the deposit was proper and DKT was fully entitled to its commission.

The judgment is affirmed.

P.2d 29 (1910). Finally, this is not a case of impracticability, which involves conditions approaching impossibility. *See* Transatlantic Fin. Corp. v. United States (1966), 124 U.S.App.D.C. 183, 363 F.2d 312, 319. Merely a somewhat greater expense of performance than anticipated, is insufficient. Restatement, Contracts 467 (1932); Kennedy v. Reece, 225 Cal.App. 2d 717, 724–727, 37 Cal.Rptr. 708 (1964);

Klauber v. San Diego Street-Car Co., 95 Cal. 353, 358, 30 P. 555 (1892); Carlson v. Sheehan, *supra*; Mineral Park Land Co. v. Howard, 172 Cal. 289, 156 P. 458 (1916). *See also* City of Vernon v. City of Los Angeles, 45 Cal.2d 710, 717–721, 290 P.2d 841 (1955) (extreme hardship); Foster v. Atlantic Ref. Co. (5 Cir. 1964), 329 F.2d 485, 489.