COPYLEASE CORPORATION OF
AMERICA, Plaintiff,

v.

MEMOREX CORPORATION,
Defendant.

No. 75 Civ. 2455.

United States District Court,
S. D. New York.

Nov. 12, 1975.

Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, New York City, for plaintiff; Franklin B. Velie, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant; John R. Vaughan, Thomas J. Kavaler, New York City, of counsel.

## MEMORANDUM, FINDINGS OF FACT AND CONCLUSIONS OF LAW

LASKER, District Judge.

In this diversity action, Copylease Corporation of America (Copylease) seeks specific performance and damages for breach of contract from Memorex Corporation (Memorex). Pursuant to Rule 65(a)(2), Fed.R.Civ.P., trial on the merits was advanced and consolidated with the hearing on Copylease's renewed application for a preliminary injunction.[1]

### I.

Memorex manufactures goods used in the operation of automatic copying machines and Copylease distributes and sells such goods. On April 4, 1974 the parties[2] entered into a contract whereby Memorex agreed to sell three types of products to Copylease, Memorex Premium Toner, Memorex Developer and private label toner. The contract was to run for an "initial term," defined to commence on the date of execution and to "continue for a period of 12 months from the date of the first shipment of [private label]," and granted Copylease the right to renew for successive twelve

1. By Memorandum dated July 10, 1975 we denied without prejudice Copylease's initial motion for a preliminary injunction 397 F. Supp. 853. Shortly thereafter Copylease renewed its motion. In response, Memorex moved to dismiss the complaint or, in the alternative, for summary judgment. Copylease, in turn, filed a cross motion for summary judgment. After oral argument on the summary judgment motions, we determined that in spite of substantial agreement between the parties on the facts, there existed a triable factual issue relating to events which transpired at a meeting between the

parties in November, 1974. Because of the uncomplicated nature of the factual dispute, and in the interests of economy, trial on the merits was consolidated with the hearing on the renewed motion for a preliminary injunction.

2. The actual parties to the contract were Memorex and Graphicom Corporation, a wholly owned subsidiary of Copylease. Graphicom subsequently assigned its rights under the contract to Copylease, and for convenience we refer to Copylease as the contracting party.

month periods provided that it maintained a certain level of purchases.[3]

This case turns on the interpretation of the apparently simple definition of "initial term" in the context of the rocky relationship which developed between the parties shortly after they entered into the contract and on the legal significance of Copylease's renewal rights.

As it turned out no private label was shipped, or even ordered, prior to the alleged breach on April 10, 1975. Both parties agree that under § 2309(1) of the Uniform Commercial Code of California[4] (the contract specifies it is to be governed by California law) the first shipment, and therefore the order, is required to take place within a "reasonable time."

Memorex contends that under the contract, a reasonable time could in no circumstances be greater than one year, and that the contract therefore expired on April 4, 1975. It also asserts that under Cal.U.C.C. § 2309(2)[5] it had the right to terminate the contract at will because the contract is indefinite in duration.

Copylease counters that at a meeting in November, 1974, it was prepared to place an order for private label and was prevented from doing so by Memorex's repudiation of the contract. Further, Copylease argues that on April 21, 1975,

only 17 days after the first anniversary of the contract's signing, it communicated to Memorex in writing its desire to order private label and requested assurances, which were not forthcoming, that such an order would be fulfilled. It is the position of Copylease that Memorex's repudiation of the contract in November discharged Copylease from the obligation to order private label. Alternatively, Copylease claims that in light of the history of the contractual relationship, it was reasonable that its written demand for assurances was not made before April 21, and that the initial term had therefore not expired. Finally, Copylease maintains that the contract is not of indefinite duration within the meaning of Cal.U.C.C. § 2309(2).

## II.

### A. The Pre-November Relationship

Pursuant to the terms of the contract Memorex began shipping Memorex Toner to Copylease on a regular basis. (Ex. 4) During the course of their dealings, however, certain frictions arose. (Tr. 10, 35) Copylease complained of an attempt by Memorex to establish another dealer in the territory of its exclusive. (Tr. 10; Ex. 2) Memorex objected to attempts by Copylease to expand the coverage of the exclusivity provision beyond the provisions of the contract. (Tr. 39–40; Ex. E) There were also disagreement on price and complaints by

---

3. As the provision for the term of contract is important to this dispute, it is set forth here in full:

"3. *Term of Agreement*
This Agreement shall commence on the date hereof and shall continue for a period of 12 months from the date of the first shipment of [private label toner] (the 'initial term'). So long as Graphicom is not in default hereunder, and if it shall have purchased an aggregate of 25,000 cartons of [Memorex Premium Toner and private label toner] during the initial term, it shall have the option to renew this Agreement for one additional 12-month period on the terms and conditions hereof. Thereafter, this Agreement may be renewed by Graphicom for successive 12-month periods on the terms and conditions hereof if it shall have purchased

an aggregate of 25,000 cartons of [Memorex Premium Toner and private label toner] during the immediate preceding 12 months, and further provided that the product prices . . . . may be increased for any renewal period to reflect actual increases in direct raw material, labor and other direct costs."

4. Cal.U.C.C. § 2309(1) provides:
"The time for shipment or delivery . . . . under a contract if not provided . . . . or agreed upon shall be a reasonable time."

5. Cal.U.C.C. § 2309(2) provides:
"(2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."

Copylease about what it perceived to be discriminatory treatment in comparison to other Memorex dealers. (Exs. B, C & D) By late October, 1974 mutual dissatisfaction with the course of the relationship had reached a point at which both sides agreed that a meeting was necessary to resolve their differences. (Exs. C & D)

### B. The November Meeting

The meeting was held in late November at the Minneapolis offices of Copylease. It was attended on Memorex's behalf by Warren King, General Manager, George Cotroneio, National Sales Manager, and the corporate counsel, Daniel Leckrone. Copylease was represented primarily by its President, Herbert Getzler, and its counsel, Alan Shalov, but there were four or five other employees on hand. It was understood that the purpose of the meeting was to discuss the clarification and possible modification of the contract, although the primary impetus for modification came from Memorex. (Tr. 18–19, 114–16; 211) Copylease, as is understandable from a reading of the document, was not unsatisfied with the terms of the contract, but was willing to negotiate changes if Memorex offered an attractive quid pro quo. (Tr. 18–20; Ex. 8)[6]

The meeting was consumed largely by an airing of complaints and proposals for a revision of the contract. Tempers flared more than once, each side feeling that the other had been and was continuing to be unreasonable. (Tr. 26, 121, 124, 154, 167, 182, 212) Shortly after the meeting started Memorex accused Copylease of being in breach of the contract for failure to purchase a monthly quota of Memorex Toner and for selling the products of other manufacturers. Copylease rejoined that the contract set no monthly quota, that in any event, it had purchased much more

Memorex Toner than Memorex claimed, and that the contract explicitly permitted it to sell the products of other manufacturers. (Tr. 20–24; Exs. 4 & 11)

At one point during a heated interchange in which King or Cotroneio had raised questions as to the validity of the contract, (Tr. 24–25) Leckrone, who was new to the Memorex organization and had had nothing to do with drawing the contract, interjected that in his view, there existed an "unworkable business agreement" which does not represent "any mutually acceptable basis for doing business." (Tr. 171; 128–30) He added that in his view there was a "substantial question" of the validity of the contract. (Tr. 172) His doubts were based on his belief that the contract might not represent the bargain of the parties and his concern that the contract apparently had no beginning and no end. (Tr. 175) He suggested a possible conflict with the anti-trust laws. (Tr. 176; 216) The clear import of his remarks, if not his express words, was that the contract was not a binding commitment. (Tr. 178) Be this as it may, however, no one from Memorex expressly declared that it would not perform under the contract. (Tr. 65, 177)

After a lunch break during which the parties caucused to develop proposals for negotiation, the meeting resumed. When Copylease presented its list of negotiable items, an angry exchange took place between Shalov and King. Shalov said he got the feeling that King just didn't want to do business with Copylease and King replied:

"You are right, that the business had evolved to such a point that we were tired of the continuous threats, harassments, threats of lawsuits; that I didn't want to continue the business under the . . . present relationship." (Tr. 208; 26, 212)

---

**6.** Copylease secured several advantageous provisions in negotiating for this contract. In return for its promise to buy at least 15,000 cartons of Memorex Toner during the initial term, Copylease received a favorable price. (Ex. F) In addition, the contract grants Copylease an exclusive dealership in Memorex Toner and Developer in a substantial area of the Midwest. The provision for sale of private label met Copylease's evident desire to begin marketing a house brand toner to compete with the Memorex, IBM and Xerox toners it already carried.

Near the close of the meeting, Getzler raised the issue of private label. He had prepared a purchase order that morning to present at the meeting as a demonstration of his good faith desire to see the contract through, as well as in anticipation of possible questions by Memorex about the term of the contract. (Tr. 34–35, 218–19) Getzler stated that he had brought the purchase order and had been prepared to place it that day, but that

"[I]t wouldn't be prudent . . . to go out and solicit business for a product where I wasn't sure I could have a source of supply, and that unless they assured me they would honor the contract, which they had just told us they considered not to be binding, I couldn't place the order . . . at that time." (Tr. 27–28; Exs. 8 & 11)

The meeting terminated on this inclusive note, with the understanding that Memorex would submit a proposed revised contract to Copylease within the near future. (Tr. 28–29; 185–86; 217) Getzler did not ask for an express commitment to deliver private label, if ordered, and Memorex did not expressly refuse to do so. (Tr. 220)

### C. Post November Negotiations

According to the understanding reached at the conclusion of the meeting, Memorex submitted a proposed substituted contract to Copylease on January 10, 1975. Copylease responded with a counter proposal on March 19th. Finally, Memorex sent a third proposed revision to Copylease on April 10th. Throughout this period Copylease continued to order and receive Memorex Toner and Developer but no orders for private label were placed. (Tr. 66–68; 206)

In the covering letter to the April 10th proposal, Cotroneio reviewed the history of their past disagreements. In reference to the November meeting he stated:

"[W]e outlined to you what we considered to be substantial problems regarding the various terms and provisions of the 'Volume Supply Contract' signed in March and April of 1974, most of which seemed to have their origin in the document's failure to either completely or accurately reflect the bargain of the parties. Your suggestion that the subject document represented a binding obligation in perpetuity to sell to you at prices not available to your competitors for your re-marketing either inside or outside the described geographical area within which no one else can distribute our products whether or not you wish to effectively develop such market is clearly outside the contemplation of the parties, the document, and the law. Consequently, we indicated to you our conclusion that the document did not bind the parties and proceeded to discuss a variety of areas with respect to which modification might be made in an effort to structure a viable transaction and document more closely reflecting the intentions and preferences of the parties."

He closed the letter as follows:

"[This proposal] represents the extent to which we as a manufacturer are either willing or able to modify the terms upon which we do business . . . ."

\*    \*    \*    \*    \*    \*

"You have . . . repeatedly indicated your eagerness to not further defer the finalization of this transaction. We share those sentiments and are no longer willing to continue our interim efforts to maintain a relationship based on the April 1974 document which, as we have indicated to you, we do not consider to be of any force or effect. From and after May 1, 1975, and, absent the prior resolution of any problem which may be outstanding with respect to the Agreement tendered herewith, your status will become that of a conventional Dealer and product will be made available to you only upon the terms and conditions generally available to Dealers

similarly situated. Orders received on or before April 30 will be accepted at der private label within a reasonable the price schedule currently available to you and in quantities consistent with the course of our business to date."

Getzler responded to this ultimatum in a lengthy letter dated April 21, reaffirming his position that the contract did represent the bargain struck one year earlier. He disputed Cotroneio's allegation that at the November meeting he had claimed the contract to be a binding obligation in perpetuity:

> "Certainly, the existing Agreement does not call for you selling to us in perpetuity. As you are aware, the initial term of that Agreement is to run for 12 months from the date of the first shipment by you to us of private label toner. (See Section 3 of our existing Agreement). I am sure that you will recall that we all agreed and understood that we would build up the Memorex Premium Toner business first and then, after a reasonable period of time, add the private label toner . . . As you will recall, I told you at our November, 1974 meeting that we were prepared at that time to begin the private label toner program but that we obviously could not do so in light of your stated intention not to honor our contract. We told you then, and I repeat today, that we are ready and willing to begin the private label toner program should you agree to honor the terms of our existing contract. Obviously, it would not be prudent of us to risk our reputation by committing for the delivery of a product which might not be available to us."

Getzler's letter ended with the following words:

> "We have every intention of continuing to honor our existing contractual obligation with Memorex and expect you to honor your obligations to us. As we have indicated in the past, we are not seeking to re-negotiate the contract, but, if you wish to negotiate some changes, we would consider giving up some of our rights under that contract in exchange for concessions in other areas by Memorex. None of the revisions proposed by you are satisfactory to us. Clearly, you are asking us to give up contractual rights which are of value to us and to give us nothing in exchange.

> "We have invested substantial time and money in developing our toner business to this point and have just reached the stage where we are generating profits which will allow us to recoup our investment and earn the handsome returns which prompted us to go into this business. We are anxious to begin to sell private label toner manufactured by Memorex and will promptly take steps to begin this program when we have your written agreement to honor the terms of our existing contract. In the meantime, we will continue to do business with Memorex as provided for under the terms of that contract."

On May 6th, Cotroneio again communicated with Copylease, indicating his intent to effectuate a change in the latter's status regarding orders placed after May 1st. The complaint in this action was filed on May 23rd.

### III.

■■ Contrary to the argument of Copylease, Memorex's behavior at the November meeting did not constitute anticipatory repudiation of the contract. Such repudiation occurs only upon a definite and unequivocal refusal to perform. *Gold Mining & Water Co. v. Swinerton*, 23 Cal.2d 19, 29, 142 P.2d 22, 27 (1943), cited with approval in *Ocean Air Tradeways, Inc. v. Arkay Realty Corp.*, 480 F. 2d 1112, 1116 (9th Cir. 1973); *Pacific Coast Eng. Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 894–95 (9th Cir. 1969) (applying California law) and cases cited there. Although Memorex did declare that the contract was not binding, it never expressly stated that it would not perform nor that it would not deliver private label if ordered. Therefore, no anticipatory repudiation oc-

curred, and Copylease's obligation to or-time was not discharged under Cal.Civ. Code § 1440.[7]

On the other hand it is plain that after the November meeting Copylease had ample reason to be concerned about the stability of the contractual relationship. It must be remembered that at the meeting, after unsuccessfully accusing Copylease of having breached the contract, Memorex, by its attorney, declared the contract to be invalid and King, the General Manager of Memorex, angrily asserted that he no longer desired to do business with Copylease. Such behavior could reasonably have been interpreted by Copylease to indicate that Memorex had resolved to find a way out of a contract which it appeared to believe unfavorable, or at least unsatisfactory to it. Getzler had good reason to doubt that any order he might place for private label would be promptly filled, or at least to believe that it would not be filled without a prior attempt by Memorex to secure the contract modifications it sought.

■ In the wake of the meeting, Copylease had reasonable ground for insecurity and could have chosen to submit a written demand for assurances under Cal.U.C.C. § 2609(1).[8] Under this statute, however, the making of such a demand is merely authorized, it is not required. See White & Summer, Uniform Commercial Code, § 6–2 at 170 n. 11. At the conclusion of the meeting the parties agreed to attempt to renegotiate the agreement in the ensuing months. In these circumstances, it is perfectly understandable that Copylease refrained from throwing down the glove under § 2609(1), and chose instead to attempt to reach an amicable settlement of the difficulties.

■ Upon receipt of Cotroneio's letter of April 10th, Getzler did submit a prompt written demand for assurances.[9] Cotroneio responded on May 6th with an emphatic reaffirmation of Memorex's intention unilaterally to alter the terms of their relationship, and gave no indication of a change of heart prior to May 21st. Therefore, unless Memorex is correct that the contract expired prior to this time or that it had the right to cancel the contract at will, it is clearly in breach under Cal.U.C.C. § 2609(4) which provides that:

"After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurances of due performance as is adequate . . . is a repudiation of the contract."

Memorex vigorously presses its contention that the initial term expired on April 4, 1975. Under Cal.U.C.C. § 2309(1), where the contract does not provide the time for shipment, as was true of the private label provision here, the shipment, and therefore Copylease's order, must occur within a reasonable time. See pp. 627–628, *supra*. Memorex urges that the language of paragraph 3 of the contract, note 3, *su-*

---

7. Cal.Civ.Code § 1440 provides:
"If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."

8. Cal.U.C.C. § 2609(1) provides:
"(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."

9. It is arguable that Cotroneio's letter of April 10th constituted an anticipatory repudiation, to which no demand for assurances was required. A request for contract modification, coupled with an absolute refusal to perform under any other interpretation constitutes anticipatory repudiation. *Pacific Coast Eng. Co. v. Merritt-Chapman Scott Corp.*, 411 F.2d 889, 895 (9th Cir. 1969) and authorities cited there.

*pra,* which defines Copylease's right to renew for successive 12 month periods, and particularly the second sentence which refers to an *"additional* 12 month period,"* (Memorex's emphasis) establishes that a reasonable time could not, under this contract, be more than one year. We disagree.

■ Memorex's position would have considerably more appeal if Copylease's demand for assurances had not come only 17 days after the anniversary date, which it seeks to read into the contract as an outside limit. A more fundamental problem with the argument, however, is that the attempt to impose on the term "reasonable time" an absolute limit of 365 days is at odds both with the plain meaning of the word "reasonable," in which the concept of flexibility inheres, and with the language of Cal.U.C.C. § 1204(2), which states:

"What is reasonable time for taking any action depends on the nature, purpose and circumstances of such action."

Comment 2 to this section makes clear that the circumstances of the transaction and the course of performance are important determinants of reasonableness. We have already indicated our view that in the context of this transaction, it was not unreasonable for Copylease to refrain from ordering private label until the renegotiations were resolved. *A fortiori,* the initial term did not expire on April 4th.[10]

■ Neither are we persuaded by Memorex's alternative argument that under Cal.U.C.C. § 2309(2) (see note 5, *supra*) it had a right to terminate the contract at will because it is a contract of indefinite duration. *Liberty Industrial Sales, Inc. v. Marshall Steel Co.,* 272 F.2d 605 (7th Cir. 1959), a case decided under California law, is directly on point. The contract in *Liberty,* like the contract here in issue (see note 3, *supra)* granted successive, one year renew-

al options to the plaintiff-buyer so long as it met a certain quota of purchases. It set no final termination date but was subject to cancellation if the quota was not met. The court held that under the California cases, the contract was not indefinite in duration so as to be terminable at will. Although *Liberty* predates California's adoption of the U.C. C., § 2309(2) simply codifies pre-Code case law, see California Code Comment, Cal.U.C.C. § 2309(2) (West 1964), and we have been cited to no cases which cast doubt on the continued validity of its holding.

■ Memorex attempts to distinguish *Liberty* by pointing out that in that case the buyer had met its quota while Copylease has not. The question whether this contract is of "indefinite duration" within the meaning of § 2309(2) because it grants a seemingly endless right to renew conditioned upon the maintenance of a certain level of purchases, however, is entirely separate from the question whether the purchase quotas have been met. It is a question of contract construction which looks solely to the terms of the contract, not to the performance of the parties thereunder. Further, the question whether Copylease has met its purchase quota for the initial term is premature, in light of our holding today that the initial term was still in effect on April 10th.

### IV.

We conclude that by its letters of April 10th and May 6, 1975, Memorex breached the contract and is liable therefor.

The foregoing constitutes our findings of fact and conclusions of law.

Submit proposed judgments with supporting memoranda *(and affidavits if necessary)* on the question whether injunctive relief should or should not be granted.

---

10. In its post trial brief Memorex shifted its position slightly, arguing simply that in view of the totality of paragraph 3 of the contract, the "initial term" is clearly in-

tended to be of 12 months duration. The contention is flatly contradicted by the plain words of the contract.