ST. PIUS X HOUSE OF RETREATS, SALVATORIAN FATHERS, A
NEW JERSEY CORPORATION NOT FOR PROFIT, PLAINTIFF-
RESPONDENT AND CROSS-APPELLANT, v. THE DIOCESE OF
CAMDEN, NEW JERSEY, A RELIGIOUS CORPORATION OF
THE STATE OF NEW JERSEY, AND FRED A. GRAVINO,
DEFENDANTS-RESPONDENTS AND CROSS-RESPONDENTS,
AND ALBERT DiSALVIO AND MARY DiSALVIO, HIS WIFE,
ADDED DEFENDANTS-APPELLANTS.

Argued October 6, 1981—Decided April 5, 1982.

*James H. Landgraf* argued the cause for appellants (*Myers, Matteo, Rabil & Norcross*, attorneys).

*Martin F. McKernan* argued the cause for respondent and cross-respondent The Diocese of Camden, New Jersey, etc. (*McKernan and McKernan*, attorneys).

*Charles W. Heuisler* argued the cause for respondent and cross-appellant (*Archer, Greiner & Read*, attorneys; *Gary J. Lesneski*, on the brief).

*Robert E. Edwards* argued the cause for respondent and cross-respondent Fred A. Gravino (*Montano, Summers, Mullen & Manuel*, attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

We granted certification in this case primarily to consider the proper measure of damages to which a vendee of realty is entitled upon the vendor's breach of an executory contract. Also involved are questions of reformation and an attorney's obligations when engaged to represent the seller.

Plaintiff, St. Pius X House of Retreats, Salvatorian Fathers (Salvatorians), contracted to sell an 8½ acre tract of land (Lot 2H) in the Township of Gloucester to Albert and Mary DiSalvio (DiSalvios) under an installment arrangement with title to pass upon the final payment. Several years later, but during the installment period, plaintiff mistakenly included this parcel with other land in a conveyance to the Diocese of Camden (Diocese).

The error remained undetected until the DiSalvios were about to take title. At that time Fred Gravino, the lawyer representing the Salvatorians, discovered the problem.

Plaintiff Salvatorians instituted this action seeking reformation of the deed to the defendant Diocese, and damages against its lawyer, defendant Gravino, for any losses it might suffer. Plaintiff joined the DiSalvios as defendants asserting the DiSalvios had breached their agreement to acquire the property. Gravino asserted a cross-claim against the Diocese for indemnification. The DiSalvios counter-claimed for specific performance or in the alternative for damages, cross-claimed against Gravino for damages based on his negligence, and cross-claimed against the Diocese asserting a prior right to the property.

The trial court granted defendant Gravino's motion, in which the Salvatorians joined, for partial summary judgment against the DiSalvios, denying them the right to damages based upon the benefit of the bargain. It held that, if the DiSalvios prevailed on their claim for breach of contract, then damages would consist of the monies they had paid under the installment contract. After a plenary trial the trial court in a letter opinion found the plaintiff was not entitled to reformation. It held that plaintiff had breached its contract of sale with the DiSalvios and ordered that all monies paid under the installment contract be returned. The court also concluded that Gravino had not been negligent and dismissed the actions against him. The Salvatorians and the DiSalvios appealed. The Appellate Division affirmed on the opinion below. We granted the DiSalvios' petition for certification. 87 *N.J.* 314 (1981), and the Salvatorians' cross-petition, 87 *N.J.* 359 (1981).

The facts are virtually undisputed. The plaintiff Salvatorians originally purchased two tracts of land in Gloucester Township in 1962 from John and Mildred Hopkins. One tract contained a structure which the Salvatorians used as a retreat (Retreat House). The other property, which was not contiguous but was located nearby, is the subject matter of this dispute. It is

designated on the Gloucester Township tax map as Lot 2H. Defendant Gravino, who represented the Hopkinses in the sale, prepared the deed, which contained a metes and bounds description and did not refer to lot and block numbers.

In August 1966, the DiSalvios entered into an agreement with the Salvatorians to purchase Lot 2H. The DiSalvios were not represented by counsel in this transaction. Defendant Gravino, now representing the Salvatorians, prepared an installment purchase agreement. The purchase price was $12,500. A down payment of $2,000 was to be followed by monthly installments of $100, commencing in September 1966 until the balance was paid. Upon payment of the balance, the seller was to deliver a warranty deed free and clear of all encumbrances. The settlement was to occur at Gravino's office. The same metes and bounds description which appeared for this tract in the Hopkins deed to the Salvatorians was incorporated in the contract. The agreement was not to be recorded by the buyers and recordation would constitute a default entitling the seller to immediate possession. It was explained at the trial that the clause was inserted to protect the seller, so that if the buyers defaulted, the title would not be cluttered with the sales contract. The DiSalvios were entitled to immediate possession and were responsible for taxes, which the seller might, at its option, pay. The DiSalvios took possession, but did nothing other than installing two no trespassing and three no hunting signs and cutting some grass.

When the Salvatorians encountered financial difficulties, it decided to sell all its properties. In November 1968, the Salvatorians' provincial director, Father DeBruin, met with Bishop Guilfoyle of the Camden Diocese to discuss a possible sale of its Gloucester Township land. The Bishop indicated an interest which led to negotiations. Each side retained an appraiser. The appraisers examined the local tax maps to identify the property owned by the Salvatorians. They assumed the maps were accurate and included Lot 2H in designating the properties to be sold. Both appraisers evaluated the land value at the rate

of $1,750 per acre for 150 acres or $262,500. It is clear that the Salvatorians did not intend to sell Lot 2H, but believed that only the Retreat House structures and adjacent land were to be included in the sale.

Father Herron was in charge of the matter on behalf of the Diocese. In January 1969, he inspected the area, including the noncontiguous tract of land, Lot 2H. It was his understanding that this land was to be included since the appraisals referred to Lot 2H.

On February 26, 1969, the parties entered into an agreement of sale, which had been prepared by counsel for the Diocese. The property was described as:

[A]ll those certain parcels of land and premises being and situate in the Township of Gloucester, County of Camden and State of New Jersey, designated on the Tax Maps ...., as plate 31, Block 357, Lots 2H, 2J, 3, 4, 5, and 7, consisting of 150 acres, be the same more or less, and including the lake area in Lot 2J.

The purchase price was fixed at $810,000, a price substantially influenced by offers made by third parties to the Salvatorians. The price exceeded both appraisals, but this did not deter the Diocese. It was motivated by the desire to ease the Salvatorians' financial plight and to continue the Salvatorians' religious works at the Retreat House.

After the contract was executed, Father Herron ordered a survey of the property and a title report. The Salvatorians engaged Gravino. They sent him the contract and instructed him to "draw up the necessary papers to expedite this sale and represent us at the closing on March 14." He received a preliminary title report from Lawyers Title Insurance Corporation that referred to the properties in the same manner as the contract. Subsequently, he was sent a metes and bounds description of the two tracts, which he used in preparing the deed. This description, which also appeared in the final title report, described two tracts, the first containing 8.591 acres (Lot 2H) and the second containing 151.12 acres for a total of 159.711 acres. Gravino prepared a deed containing this description as well as the affidavit of title. At his request these documents

were executed and returned to him. He never requested, received or examined the survey, although the survey was produced at the closing on April 2, 1969. At the closing Gravino delivered the deed he had prepared.

The DiSalvios continued to make their monthly payments to the Salvatorians. In November 1974, approximately six months before the deed was to be delivered to them, Gravino detected that the land had been included in the deed delivered to the Diocese.

## I

### Reformation

The traditional grounds justifying reformation of an instrument are either mutual mistake or unilateral mistake by one party and fraud or unconscionable conduct by the other. *Heake v. Atlantic Cas. Ins. Co.,* 15 *N.J.* 475, 481 (1954); *Downs v. Jersey Central Power & Light Co.,* 117 *N.J.Eq.* 138 (E. & A. 1934). The parties agree on these principles, but differ on their application. Plaintiff urges that both parties intended a conveyance of only the lands owned by the Salvatorians when the contract was made and therefore a mutual mistake existed. Alternatively, the plaintiff argues that if the mistake was not mutual, the conduct of the Diocese was such as to warrant reformation. Resolutions of these questions are essentially factual. The trial court found that the Diocese was not mistaken and its conduct was not unconscionable. The Appellate Division agreed and we are satisfied that there is sufficient record support for these conclusions.

When the contract was entered into, the intention of both parties was the same, that is, that Lot 2H was to be included in the sale. The Salvatorians made a mistake by incorporating Lot 2H into the transaction, but that mistake was not shared by the Diocese. A flaw in the dissenting opinion's argument is its incorrect *factual* assumption that the parties were committed in November 1968 to a purchase and sale of land which did not

include Lot 2H. In the first place, the parties had commenced negotiations only in November 1968. At that time the Salvatorians and the Diocese had agreed that each would have an appraisal made and then discuss the matter further. The Diocese's appraiser eventually evaluated the property at $673,500. When the Salvatorians pointed out that several other prospective buyers had made offers, one of which was for $800,000, the Diocese raised its offer to $810,000 and the agreement was made. This occurred after the appraisals were completed and immediately before the contract of sale was drawn and executed on February 26, 1969.

Moreover, in November 1968, the Diocese did not know exactly what land was involved. Father Giles of the Salvatorians had given the lot numbers, including 2H, to Guy Elvey, the Salvatorians' appraiser. Elvey testified that, although he did not include Lot 2H in his property evaluation, he identified the subject property in his report as "Lots 2–H, 2–J, 3, 4, 5 and 7, Block 357, Plate 31, on the Tax Map of Gloucester Township."

Samuel Gilbert appraised the property for the Diocese. He examined the tax records, found that Lot 2H was in the Salvatorians' name and included it in his appraisal. He also attached as an exhibit to his report a copy of the tax map. The map showed Lot 2H, separated by a small body of water from Lot 2J. He had circled in red the lot numbers of the parcels to be sold including Lot 2H. Gilbert had also been given a survey by the Salvatorians made by T.A.M. Fisher, dated December 1961, of the premises of "St. Pius X House of Retreats Salvatorian Fathers Inc." It did not delineate the tax lots, but did show the entire property, incorporating Lot 2H. The survey also disclosed that the Lot 2H area consisted of 8.591 acres. When Gilbert made his on-site inspection, the ground was heavily laden with snow. However, he did walk along the easterly side of Cheeseman Road, including that section of the road adjacent to Lot 2H. He calculated the property had a frontage on that road of 4,844 feet, of which 717.67 feet was attributable to Lot 2H. As noted

above, the evaluation of the property and buildings was $673,-500.

Gilbert's appraisal was certified on January 14, 1969. The deal was structured only after the appraisals were made. At that time the parties had the appraisals and the tax map, both of which referred to Lot 2H. This was followed by Father Herron's inspection of the property in which he personally examined Lot 2H.

After the contract was signed in February, the survey was made at the request of the Diocese. This survey included Lot 2H, and the metes and bounds description utilized for the deed was derived from that survey. It must be remembered that the prime purpose of the survey, as in any real estate transaction, was to graphically depict the precise location of the land to be conveyed and to confirm the quantity of land being acquired.

The extent of the acreage involved, the identity and location of the tracts, and the purchase price were not determined until after the Gilbert report was received in January 1969. The Diocese believed at the time it entered into the contract and when it closed the transaction that the Salvatorians owned Lot 2H and were legally capable of conveying that tract. There was no mistake about that. Though the Salvatorians may have intended to sell only what they lawfully owned, the Diocese had been led to believe, and did believe, that such ownership included Lot 2H. This is a position the Diocese has continued to take throughout this litigation.

Reformation predicated upon mutual mistake requires that both parties are in agreement at the time they attempt to reduce their understanding to writing, and that the writing fails to express that understanding correctly. No case cited by the dissent holds otherwise. A general understanding that A will purchase and B will sell some land—the identity, location and extent to be subsequently determined—cannot be the basis for reformation. The reason is because no understanding has been

reached with respect to the essential terms of the contract. Implicit in the general understanding is the recognition that when the parties arrive at the point of preparing an enforceable contract they will specify the precise property to be conveyed.[1]

*Perron v. Lebel,* 256 A.2d 663 (Me.Sup.Ct.1969), upon which the dissent relies heavily, does not hold otherwise. There the parties had agreed one particular lot was not to be included in the sale. It mistakenly was, and reformation was held to be in order. That is a classic illustration of a misstatement in the contract of the parties' understanding. See *Restatement (Second) of Contracts* § 155 (every illustration of mutual mistake involves a specific term or provision on which the parties had agreed and was erroneously expressed in the written contract). Corbin's treatise on *Contracts* summarizes the principle as follows:

> Whatever may be the form of the transaction as analyzed above, and whatever may be the explanatory theory as to when and how the contract became binding, a court will not decree reformation unless it has convincing evidence that the parties expressed agreement and an intention to be bound in accordance with the terms that the court is asked to establish and enforce. If the writing accords with the expressed intentions of one party, the court will not hold him bound by a different contract. If it does not accord with the intentions of the other party, or if his assent was induced by an antecedent unilateral mistake, he may perhaps get rescission and restitution, but he is not entitled to reformation.

New Jersey adheres to this rule. See *Central State Bank v. Hudik-Ross Co.,* 164 N.J.Super. 317, 323 (App.Div.1978) ("For a court to grant reformation there must be 'clear and convincing proof' that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to

---

[1] A flaw in the dissent's analysis is its reliance on a preliminary oral understanding. Suppose that in its initial discussions the Salvatorians stated that they wished to sell all their holdings in Gloucester Township specifying the lot and block numbers, including Lot 2H, and the Diocese indicated a willingness to purchase those properties. Reformation of the subsequently executed contract expressly including Lot 2H would not lie, there being no mistake on the part of the Diocese. The fact that lot numbers were not mentioned in the original discussions should not change the result.

be."); *Lord, Inc. v. Municipal Utilities Authority, Tp. of Lower, Cape May,* 133 *N.J.Super.* 503, 507 (App.Div.1975) ("[Reformation] normally arises when the agreement fails to specify correctly the terms that the parties agreed upon, such as where a deed absolute on its face was actually intended to be a mortgage."); *By-Fi Bldg. & Loan Ass'n v. N. Y. Casualty Co.,* 116 *N.J.Eq.* 265, 267–68 (Ch.1934) ("Only upon the production of proof clear, convincing and free from doubt that the contract in its reformed and not original form is the one that the contracting parties understood and meant it to be—and as in fact it was but for the alleged mistake in its drafting—will this court grant an applicant [reformation].").

Furthermore, the Diocese was not guilty of any unconscionable conduct. At the first conference concerning the possible sale, Father DeBruin of the Salvatorians referred to the amount of land involved as 160 acres. Though the contract referred to 150 acres more or less, the survey determined the exact acreage. Father Herron wrote the Bishop, "The surveyor informed us that the total acreage that we are purchasing is 160.576 including the lake area." All the foregoing information was equally available to the seller. The Diocese had no reason to call to Gravino's attention or that of someone else acting on behalf of the Salvatorians what the precise acreage was. Indeed, the actual amount, 159.711 acres, was nearly the same as stated initially. That two noncontiguous tracts were involved coincided with the tax map and the physical inspection. The Diocese had no inkling that the Salvatorians did not intend to include Lot 2H in the transaction.

Accordingly, the record support for the trial court's factual conclusion is ample. We discern no palpable error or other reasons demonstrating a clear miscarriage of justice in the factual findings made below. Those findings were reasonably reached on sufficient credible evidence in the record. *State v. Johnson,* 42 *N.J.* 146, 162–63 (1964).

## II

### Loss of the Bargain

#### A.

The trial court found that the plaintiff, Salvatorians, had breached its agreement with the DiSalvios due to its inability to convey marketable title. However, the trial court limited damages to the installments paid under the contract plus expenses incurred in examining the title and making the survey. The DiSalvios claim that they are entitled to "benefit of the bargain" damages, that is, the difference between the contract price and the market value of the land at the time the deed was to be delivered.

The traditional measure of damages when a vendor of chattels breached his executory contract is the difference between the contract price and the market value at the stipulated time of delivery. An exception to this rule with respect to contracts for the purchase of real estate developed in England beginning with a decision of the King's Bench in *Flureau v. Thornhill*, 2 *Wm.Bl.* 1078, 96 *Eng.Rep.* 635 (1776). The plaintiff had purchased a leasehold at auction. When the defendant seller discovered he did not have good title, he offered plaintiff an election to take title with its defects or to receive his deposit with interest and costs. The plaintiff insisted on also being paid the loss of the bargain. The court, noting the innocence of the vendor, held that a vendee's exclusive remedy against a vendor who could not convey because of a defective title was restitution. *Id.*

Development of New Jersey law with respect to a vendee's claim for benefit of the bargain has been uneven. When the matter first arose in *Drake v. Baker*, 34 *N.J.L.* 358 (Sup.Ct.1871), Chief Justice Beasley, relying upon *Flureau*, analyzed the issue in terms of the vendor's fault. He wrote:

> [T]he immunity of the vendor [from loss of the bargain damages] does not extend beyond his inability to perform his contract, by reason of a defection in his title which was unknown to him at the time he entered into the contract to sell. This rule will exclude all defaults which are willful, or which arise from contingencies known to the vendor, and of which he consciously assumed the risk." [*Id.* at 361]

In *Drake* the defendant had contracted to sell certain lands to the plaintiff. Defendant's wife refused to sign the deed and he was unable to fulfill his contract. The defendant was at fault for he knew when he made the contract that his wife would have to join in the deed. There was no "secret" flaw in the title and the defendant was responsible for loss of the bargain damages.[2]

The Court of Errors and Appeals rejected *Drake* in *Gerbert v. Trustees,* 59 *N.J.L.* 160 (1896). The tenant held a lease to certain premises with an option to purchase. The tenant attempted to exercise the option but the landlord had died and his executor could not convey title which was in the name of the deceased's wife. The Court was influenced by an 1874 decision of the House of Lords in *Bain v. Fothergill, L.R.,* 7 *E. & I.App.* 158, in which it denied loss of the bargain damages for breach of a contract to sell a mining royalty where the vendor could not obtain a necessary consent. Divers opinions were expressed. Some members stressed the vendor's ignorance of the defect in title and inability to cure it. The majority extended the *Flureau* remedy of restitution only to situations where the vendor breached the executory contract of sale of realty, but pointed out that an action against the vendor might still lie for deceit. The Court of Errors and Appeals followed this rationale in *Gerbert.* It denied loss of the bargain damages, but held that the plaintiff still had an action for fraud and deceit. 59 *N.J.L.* at 182–83. It analogized the vendee's contract claim to an action for breach of covenant of a warranty.

Shortly after, the Court limited the effect of *Gerbert* to situations beyond the vendor's control. In *Brown v. Honniss,* 70

---

[2]The reasoning of the *Drake* court was followed two years later in *King v. Ruckman,* 24 *N.J.Eq.* 298 (Ch.1873). Citing *Drake,* the court stated:

> [W]here a vendor of real estate unwarrantably refuses to execute his contract, the rule of damages, applicable in cases of sale of personal property, is in all respects apposite, and ... the measure of damages is the difference between the contract price and the market value at the stipulated time of delivery. [*Id.* at 305]

*N.J.L.* 260 (E. & A. 1904), the plaintiff had an option to buy a tract of land owned by the defendant. The plaintiff exercised the option, but the defendant had sold the land to the City of Newark. The plaintiff was entitled to loss of the bargain damages for the refusal to convey was attributable to "a totally inadequate reason."

The Court of Errors and Appeals further limited *Gerbert* in *Rabinowitz v. Debow*, 104 *N.J.L.* 62 (1927). The seller could not convey because one defect disclosed by the title company's search could not be removed. Loss of bargain damages was not recoverable, the Court noting in dictum that the vendor would have been responsible if he had willfully refused to convey good title.

This Court in *Ganger v. Moffett*, 8 *N.J.* 73 (1951), stated in dictum that when vendors willfully refuse to convey or do not convey for reasons within their control, loss of the bargain damages is appropriate.[3] Thus, if a vendor unjustifiably refuses to convey the property, does not convey for reasons within his control, or otherwise creates a situation that disables him from conveying the property, the vendee's damages may properly include loss of the bargain. This is distinguishable from those situations where unknown to the seller at the time he enters into the contract there is a flaw in the title. In that event, according to our case law, rescission is the proper remedy.

Most states, unlike New Jersey, do not follow the "English" rule first enunciated in *Flureau v. Thornhill* either in its original or some modified form.[4] The "American" rule permits benefit

---

[3]Judge Lane applied the rule in *Melcer v. Zuck*, 95 *N.J.Super.* 252, 260 (Ch.Div.1967), rev'd on other grounds, 101 *N.J.Super.* 577 (App.Div.1968), holding that a seller was liable for the deposit money, reasonable expenses of examining the title and loss of the bargain where seller refused at closing to permit buyer to withhold funds sufficient to pay mortgage and judgment lien.

[4]Various exceptions have been developed in those jurisdictions following the English rule. Loss of the bargain has been approved where a seller knows he does not have title and cannot convey because of inability to acquire title,

of the bargain damages to the buyer irrespective of the seller's motives or reasons for its breach of the contract. See generally 3 *American Law of Property*, § 11.67 (1952); McCormick, *Handbook on the Law of Damages*, §§ 177–78 (1935). Arguably, there should not be a difference between a seller's breach of an executory contract to sell chattels or realty. The English rule may impose on an innocent buyer a serious loss to the benefit of the seller who is at fault. This may be peculiarly true when the contract extends over a period of years while a buyer is making substantial payments upon the principal as well as improvements to the property. See generally 5 *Corbin on Contracts*, § 1098 at 531–35 (2 ed. 1964). None of the parties, however, has requested that we consider the soundness of the English rule in the form in which it apparently exists in New Jersey. We need not decide that issue and, accordingly, we have chosen not to discuss it.

### B.

The Salvatorians contend that the DiSalvios are not entitled to seek loss of the bargain damages because of *N.J.S.A.* 2A:29–1, which reads as follows:

> When any person shall contract to sell real estate and shall not be able to perform such contract because of a defect in the title to the real estate, the person with whom such contract was made, or his legal representatives or assigns, may, in a civil action, recover from the vendor, not only the deposit money, with interest and costs, but also the reasonable expenses of examining the title and making a survey of the property, unless the contract shall provide otherwise. This section shall not preclude the recovery by the purchaser from the vendor of any other damages to which he may be entitled by law.

The Legislature originally enacted this statute in 1915 in response to *Gibbs v. Cooper*, 86 *N.J.L.* 226 (E. & A. 1914), which

*Key v. Alexander*, 91 *Fla.* 975, 979, 108 *So.* 883, 885 (1926); where seller knows of defects in title and contracts to convey, *Taylor v. Barnes*, 69 *N.Y.* 430 (1877); where seller has title and refuses to perform, *Eastwood Homes, Inc. v. Hudson*, 161 *Cal.App.*2d 532, 542–543, 327 *P.2d* 29, 35–36 (Dist.Ct.App. 1958); *Householder v. Nispel*, 111 *Neb.* 156, 158, 195 *N.W.* 932, 933 (1923).

implied that damages for the seller's breach of an executory contract to sell real estate were limited to the return of the buyer's deposit. See Statement to Bill S. 66, adopted as *L.* 1915, *c.* 159. The act enabled the buyer to recover search and survey expenses in addition to the deposit funds. The legislative intent was not to inhibit or restrict the buyer's recovery.

The operative effect of the statute depends upon the existence "of a defect in the title to the real estate." Such defect refers to flaws affecting marketability that are unknown at the time the contract is made and that cannot feasibly be removed. *Cf. Herman v. Handler*, 125 *N.J.L.* 324, 326 (Sup.Ct.1940) (holding that the statute does not apply where the "defect" consisted of inability to obtain consent of a third party).

The last sentence in the original act had read:

This section shall not limit the recovery where the purchaser seeks to recover for the deceit or fraud of the vendor. [*R.S.* 2:45–1]

This sentence was modified as a part of the general revision of Title 2 in 1951 following the adoption of the Constitution of 1947. The purpose of the revision was to reconcile provisions in the statutes with the Supreme Court's Rules of Practice, to correct errors, to omit redundant provisions more properly included in the Rule and to aid the Legislature in making Title 2 into a more compact and consistent body of the law. *L.*1950, *c.* 171. The Advisory Committee on Revision of Statutes recommended no change in *R.S.* 2:45–1 in its Tentative Draft dated March 30, 1951. When enacted, the last sentence had been revised to read:

This section shall not preclude the recovery by the purchaser from the vendor of any other damages to which he may be entitled by law.

We can find no legislative history explaining this change. Since the primary thrust of the revision was procedural, it is unlikely that the Legislature intended any modification in the substantive common law. Rather, it is probable that its intent was to permit recovery under Court Rules for fraud and deceit

in the same action in which the return of deposit, interest and title and survey expenses were sought. See *Gerbert v. Trustees, supra,* which required a separate action for fraud and deceit.[5] We therefore conclude that *N.J.S.A.* 2A:29–1 has no bearing on the availability of benefit of the bargain damages.

### C.

We turn now to the facts of this case. When the Salvatorians entered into the contract with the DiSalvios in 1966, it had marketable title. There was no unknown flaw or defect in the title. The inability to convey was due to its subsequent conveyance of the same property to another. Incapability of compliance with its contractual commitment was due to its mistaken act. Under such circumstances a vendor cannot shield itself from responsibility for damages suffered by the innocent buyer. As between the two, the fault rests on the vendor.[6]

We are satisfied that the trial court erred in granting the partial summary judgment denying the DiSalvios loss of the bargain damages.

---

[5] In *Donovan v. Bachstadt,* 181 *N.J.Super.* 367 (1981), certif. granted, —— *N.J.* —— (1982), the Appellate Division interpreted the modification to alter the common law by applying the loss of the bargain damages to a situation where the vendor did not own or have a contract to acquire the property. The opinion assumes both that there was a "defect" in the title and that the common law rule limited a buyer's recovery to deposit plus interest where a title was defective. 181 *N.J.Super.* at 369, 371. As discussed above, the rule in New Jersey did not eliminate a buyer's recovery of loss of the bargain damages where there was fraud or deceit, or where the seller's refusal was attributable to an inadequate reason.

[6] The provision that the agreement was not to be recorded does not tilt the equities in favor of the vendor. The uncontradicted evidence adduced at the trial was that sellers sought such a covenant so that on default the record title would not be encumbered. It was for this reason that Gravino inserted the provision.

## III

### Attorney Liability

The Salvatorians sought indemnity for its losses from attorney Gravino, claiming that, if Gravino had properly performed the functions that he had undertaken, the Salvatorians would not have executed a deed to the Diocese that included Lot 2H.

■ It is settled that an attorney is obligated to exercise that degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise. *McCullough v. Sullivan,* 102 *N.J.L.* 381, 384 (E. & A. 1926); *Sullivan v. Stout,* 120 *N.J.L.* 304, 308 (E. & A. 1938); *Taylor v. Shepard,* 136 *N.J.Super.* 85, 90 (App.Div.1975), aff'd o. b., 70 *N.J.* 93 (1976). Perhaps the most quoted statement of the standard of care applicable in legal malpractice actions is found in *Hodges v. Carter,* 239 *N.C.* 517, 80 *S.E.*2d 144 (1954):

> Ordinarily when an attorney engages in the practice of the law and contracts to prosecute an action in behalf of his client, he impliedly represents that (1) he possesses the requisite degree of learning, skill, and ability necessary to the practice of his profession and which others similarly situated ordinarily possess; (2) he will exert his best judgment in the prosecution of the litigation entrusted to him; and (3) he will exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to his client's cause. [*Id.* at 519, 80 *S.E.*2d at 145–46]

■ What constitutes a reasonable degree of care is not to be considered in a vacuum but with reference to the type of service the attorney undertakes to perform. More specifically, where the attorney represents the purchaser of realty and has been engaged to examine the title, it has been said:

> It is the duty of an attorney, who is employed to investigate the title to real estate, to make a painstaking examination of the records and to report all facts relating to the title. He is, therefore, liable for any injury that may result to his client from negligence in the performance of his duties—that is, from a failure to exercise ordinary care and skill in discovering in the records and reporting all the deeds, mortgages, judgments, &c., that affect the title in respect to which he is employed. [*Jacobsen v. Petersen,* 91 *N.J.L.* 404 (Sup.Ct.), aff'd, 92 *N.J.L.* 631 (E. & A. 1918)]

It is his further obligation to impart to his client all observable defects, deficiencies and imperfections of title. *Toth v. Vazquez,*

3 *N.J.Super.* 379, 384 (Ch.Div.1949), rev'd on other grounds, 8 *N.J.Super.* 289 (App.Div.1950). Where an attorney negligently overlooked and failed to report a judgment that was a lien upon the land, the attorney was held liable as a matter of law to his client who had purchased the property relying upon the attorney's report. *Jacobsen v. Petersen, supra.* See also *Bayerl v. Smyth,* 117 *N.J.L.* 412, 415 (E. & A. 1927) (attorney employed to examine the title to real property must exercise reasonable care and skill in the matter, and his failure to do so is negligence for which he will be liable to his client in damages).

The central obligation of an attorney who represents a seller is to see to it that the property that the seller intends to sell is in fact conveyed. To accomplish that, there must be an accurate description in the deed. Two experts, one for the Salvatorians and one for Gravino, testified that it is not proper to use the tax map lot and block numbers in the deed. Both said that an attorney should not usually rely exclusively upon a metes and bounds description that has been furnished in a title report, but should compare and check the description with the survey. See New Jersey Institute for Continuing Legal Education, *Real Estate Closing Procedures* at 64 (1980) ("[I]t is always advisable to check the description in the [d]eed and mortgage with the survey.").

Moreover, it is incumbent on the seller's attorney to compare the property referred to in the sales agreement, at least where that has been furnished to him, with the proposed deed description. This comparison is relevant in determining that the client is conveying that which he intends to convey. Where a reasonable ground exists to suspect a material error in the determination of the amount or location of the property in question, it is his duty to investigate and report it to his client. *Passanante v. Yormark,* 138 *N.J.Super.* 233, 238 (App.Div.1975); *Spector v. Mermelstein,* 361 *F.Supp.* 30, 39–40 (S.D.N.Y.1972), mod. on another issue, 485 *F.*2d 474 (2d Cir. 1973); *Mageary v. Hoyt,* 91 *Ariz.* 41, 45, 369 *P.*2d 662, 665 (1962); *Laehn Coal &*

*Wood Co. v. Koehler,* 267 *Wis.* 297, 298–299, 64 *N.W.*2d 823, 824 (1954). See also *Owen v. Neely,* 471 *S.W.*2d 705, 708 (Ky.1971) (attorney liable where he noticed discrepancies between record and survey descriptions and failed to advise client); *Palmer v. Nissen,* 256 *F.Supp.* 497, 506 (D.Me.1966) (attorney liable where property conveyed was substantially less than that described in contract).

The attorney-client relationship may be characterized as a fiduciary one and the attorney in that capacity has a duty "to make full disclosure of all facts within [his] knowledge which are material" for his client to know for the protection of his interest. *Branch v. White,* 99 *N.J.Super.* 295, 307 (App.Div.), certif. den., 51 *N.J.* 464 (1968). An analogous situation exists between a trustee and his beneficiary. See *Restatement (Second) of Trusts,* § 173, Comment d, which reads in pertinent part:

Even if the trustee is not dealing with the beneficiary on the trustee's own account, he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest. Thus, if the beneficiary is about to sell his interest under the trust to a third person and the trustee knows that the beneficiary is ignorant of facts known to the trustee which make the interest of the beneficiary much more valuable than the beneficiary believes it to be the trustee is under a duty to the beneficiary to inform him of such facts.

The Salvatorians retained Gravino in a letter instructing him to "draw up the necessary papers to expedite this sale and represent [them] at the closing." Included in the letter was a copy of the sales contract, which contained a description consisting of tax map lot and block numbers. It also referred to a total acreage of 150 ± acres. A few days later Father Herron of the Diocese sent Gravino a metes and bounds description of the land that reflected two tracts, one consisting of 8.591 acres and the other 151.12 acres. Gravino prepared the deed and mailed it to the Salvatorians for execution. He did not point out the discrepancy between the quantity of acreage in the contract (150 ± acres) and in the deed (159.711 acres). Nor did he note that there were two separate tracts and, when the size

of the smaller was subtracted from the total, the balance of 151.12 acres would have much more nearly approximated the contract quantity of 150±. Gravino testified in deposition he did not "take particular notice of the amount to be conveyed." Moreover, if he had taken the care to peruse the survey, he would have seen that the smaller tract was not contiguous with the larger one.

The crux of the issue is whether Gravino should have brought these matters to his client's attention, particularly in view of the limited task given to him of making certain that the deed contained the correct property description. The trial court held that these circumstances would not indicate to Gravino that the Salvatorians had made an error. However, the nine acre difference could scarcely be said to be minimal. Moreover, it is arguable that Gravino should have been alerted by the circumstance that one tract alone was described as containing 151.12 acres, clearly approximating the contract quantity of 150 acres more or less. Examination of the survey would have disclosed the noncontiguousness of the parcels. Though we might be inclined to hold that he should have directed his attention to these matters, the focus of his retention being intimately related to them, we cannot in all fairness to Gravino do so on this record. The court reporter's notes of the testimony of Gravino and his expert, Henry Miller, have been lost and the reconstructed record is unsatisfactory. Accordingly, we are remanding the matter to the trial court to reconsider the issue on the basis of the record as supplemented by the parties. If the trial court does find that Gravino was negligent, it will also be necessary to determine whether that negligence was a proximate cause of the loss as well as the amount of that loss.

Judgment of liability is to be entered in favor of the DiSalvios against the Salvatorians. The judgment of dismissal of the Salvatorians' indemnification claim against Gravino is set aside and that matter is remanded to the trial court for further proceedings in accordance with this opinion. The judgment of no cause for action in favor of the Diocese is affirmed. The

dismissal of the cross-claims against the Diocese and of the DiSalvios' cross-claim against Gravino is likewise affirmed.

HANDLER, J., dissenting.

I am satisfied that the written contract of sale between the primary parties in this litigation, the Salvatorians and the Diocese of Camden, contained a mutual mistake concerning the particular tracts to be included in the land conveyance. As I read the record in this case, the parties never intended that the sale include the noncontiguous tract known as "2H", which the Salvatorians had previously sold in an unrecorded transaction and, thus, could no longer legally convey. The written agreement erroneously included this tract and did not express the true intention of the parties on this particular term. Moreover, the acreage added to the transaction by the mistaken inclusion of this tract had no bearing whatsoever on the contract price. Consequently, the contract should be reformed to conform with the parties' actual understanding. The Diocese should relinquish title to lot 2H, with no abatement of the purchase price or imposition of money damages. Therefore, I dissent from the opinion of the Court.

There is little dispute concerning the basic facts in this case. As the majority notes, the Salvatorians owned and operated the Pius X House of Retreats in Blackwood, Gloucester Township, Camden County, New Jersey. The Retreat House complex consisted of the residential retreat building, a maintenance building and a storage building, all situated on five contiguous tracts of land composing one 150-acre plot, which included part of a lake. The Salvatorians had also owned a noncontiguous tract of land north of that lake, designated as "2H" on the Gloucester County Tax Map. The Salvatorians sold that 8.6-acre tract to the DiSalvios in 1966 under a long-term installment contract which the parties agreed not to record.

In late 1968 the Salvatorians encountered severe financial difficulties which necessitated the sale of their remaining hold-

ings in Blackwood. On November 20 Father Edward DeBruin, the Salvatorians' provincial superior, and Father Peter Eltink, the Salvatorians' provincial treasurer, delivered a letter to and met with Bishop George H. Guilfoyle of the Diocese of Camden to discuss the Salvatorians' financial plight and their desire to sell their real estate holdings. The Salvatorians viewed the Diocese as not only a potential buyer for their property but also an understanding ally with whom they might make arrangements for the continued service of several of their members who wished to remain in Blackwood. The Diocese considered the Salvatorians as friends in need for whom the Diocese was ready and able to provide assistance. Even the majority acknowledges that the Diocese's motivation was its desire to aid the Salvatorians, rather than to turn a good business deal.

At the very outset the purpose of the Salvatorians was made clear. As Father DeBruin later testified: "[Our] intention was to sell all the land that we had left." The Diocese fully understood this intention. As Bishop Guilfoyle explained, the Salvatorians were offering "everything they owned and held in ... Blackwood." According to Bishop Guilfoyle, at no time did the Diocese intend to purchase land which the Salvatorians did not own. On November 25, Bishop Guilfoyle posted a letter to Father DeBruin indicating the Diocese's willingness to assist the Salvatorians.

The parties proceeded immediately with implementation of this early basic understanding. Although it was intended that the sale would involve all the legal holdings of the Salvatorians, neither party could state with any certainty the specific tracts included or the total acreage involved.[1] This uncertainty, how-

---

[1]Although Father DeBruin did not recall the precise extent of the Retreat House holdings, he initially underestimated the property to be 120 acres. In his November 25 letter, Bishop Guilfoyle mentioned 160 acres. And Father Herron, who entered the negotiations as administrative secretary of the Diocese, indicated that he was only vaguely aware of the acreage involved when the parties first embarked on the project.

ever, had no major effect upon the parties. As noted, the primary concern of the Diocese was to purchase the Blackwood operation, rather than a particular amount of land. As Father Herron confirmed in his trial testimony, the Diocese would have made the same offer regardless of the inclusion of lot 2H. Thus, the exact acreage involved was of minimal importance.

Both parties then undertook to have appraisals made to assist in setting a price. In December 1968 the Salvatorians engaged E. Guy Elvey to appraise the property. He was supplied with lot numbers, in which 2H was included. However, at that point, no one, including Elvey, knew that the property was not then owned by the Salvatorians or that it was situated north of the lake and noncontiguous to the Blackwood retreat. His report estimated the total acreage to be approximately 150 acres but did not attribute any acreage for lot 2H. Elvey appraised the property at $807,500.

Father Herron then engaged Samuel E. Gilbert to appraise the land for the Diocese. Gilbert was told that his evaluation was to "involve all of the real estate owned by the House of Retreats at that location."[2] Even though Gilbert claimed to have included lot 2H in his calculations, he was unaware that lot 2H was no longer owned by the Salvatorians. Moreover, while he did not receive a copy of the Elvey appraisal that had been submitted by the Salvatorians, Gilbert nevertheless reached exactly the same conclusions as Elvey concerning total acreage and price.

It was upon reading the tax map attached to Gilbert's appraisal that Father Herron first discovered that the Salvatorians'

---

[2] Because he had no other description, Gilbert consulted the Gloucester Township tax maps for the various lot numbers. Those tax maps showed the Salvatorians' holdings to be 157.94 acres. Gilbert also worked with two earlier surveys of the area, both of which were intended to portray all of the land involved in the transaction. One included only 131 acres, and the other did not depict any Salvatorian property north of the lake, where 2H should have been located.

holdings included a noncontiguous tract of land. He visited the Retreat House for the purpose of viewing the additional property. While Father Herron became aware that two separate tracts of land were involved, there is not the slightest indication that he had any knowledge that the Salvatorians did not own this additional, noncontiguous parcel.

The parties then met on January 23, 1969 to set a purchase price and soon thereafter agreed on a price of $810,000, almost mirroring the appraisal figures. The purchase price was strongly influenced by the fact that an outsider had offered the Salvatorians $800,000 for their Retreat House holdings. Although the approximate amount had been calculated by the assumed acreage involved, the final price was not pegged to acreage as such.

Father Herron then ordered a survey of the property, primarily to remove the survey exception for title insurance purposes. However, the written agreement between the parties was executed on February 26, 1969, before the survey was apparently completed. The contract provided for the transfer of approximately 150 acres, reflecting the appraisals.[3]

It should be reemphasized that throughout these negotiations and discussions leading to the signing of a contract, at no time did the parties waiver from their original understanding on the most basic aspect of their proposed agreement. The Salvatorians' clear intention was simply to liquidate all of the property which they still owned in Blackwood. The Diocese sought to purchase no more than the property which the Salvatorians had the legal capacity to sell. Father DeBruin and Father Eltink both testified that they thought the Salvatorians' Blackwood holdings included only the buildings and the immediately sur-

---

[3]Although Bishop Guilfoyle had thought the total acreage was 160 acres, he did not note the 10-acre discrepancy in the agreement or consider it to be material. Without reading the document, he signed it, relying on Father Herron's review. Father DeBruin signed on behalf of the Salvatorians after scanning the writing only briefly.

rounding land. They were totally unaware that the holdings included another tract legally encumbered; and they never envisioned that, physically, a noncontiguous tract was part of the Retreat House property being transferred in the written agreement of sale.

The Diocese received its survey shortly after March 6, 1969. The survey indicated that the property in question consisted of two plots of land, one of 8.59 acres and the other of 151.12 acres, with a total acreage of 160.576. It was at this point that Father Herron realized the true extent of the acreage. Nevertheless, there is no suggestion that he was aware of the legal infirmity of the Salvatorian's ownership of this extra parcel. Father Herron did not know that the inclusion of lot 2H was a mistake. He focused only upon the change in acreage and immediately sent a memorandum to the bishop indicating that the purchase included 160 acres, rather than the 150 indicated in the agreement. However, the discrepancy was never called to the attention of the Salvatorians, nor were the Salvatorians furnished with a copy of the survey.[4]

The mistake as to the inclusion of lot 2H was a mutual one. Those who were aware of the inclusion believed that it was part of the lands that the Salvatorians were legally able to convey and sought to liquidate. This mutual mistake was perpetuated through the closing of the transaction. The Salvatorians retained attorney Fred Gravino on or about March 5 to represent them at the closing. Father Herron sent Gravino the description, which included Lot 2H and the acreage figure of 160. Gravino did not suspect an error or a mistake, nor did he believe the general references to acreage were significant. He simply

---

[4]Father Herron, as noted, was not aware that the inclusion of lot 2H was a mistake. Further, although at some point during this phase of the transaction, Father Eltink became aware of the involvement of two tracts of land, he also believed the second lot was still owned by the Salvatorians, and moreover, was part of a contiguous tract which had been purchased earlier (along with 2H) as a buffer for the Retreat grounds.

incorporated the legal description into the deed. The Retreat House received a copy of the deed a short time before the settlement. However, no one compared the deed to the agreement, and the 10-acre discrepancy was never noted.

With settlement on March 20, 1969, title to the Retreat House, surrounding lands and the noncontiguous lot 2H passed to the Diocese. The fact that lot 2H was the subject of the 1966 agreement with the DiSalvios apparently went unnoticed for five years. In November 1974, with the DiSalvios about to make final payments on 2H, Gravino finally realized the error. The mistake surfaced, and the present litigation ensued.

The misunderstanding between the parties in this instance seems to me a clear case of mutual mistake for which reformation is not only an available remedy but a desirable one as well. As noted, the parties had a basic agreement on an essential aspect of the transaction—that the Salvatorians would sell all of their legal holdings in Blackwood and the Diocese would buy all of those holdings. In putting this agreement on paper, a small, noncontiguous tract (lot 2H) was inadvertently and erroneously included in the contract, even though the parcel was no longer within the Salvatorians' legal power to convey, having already been sold in an earlier unrecorded transaction. Equity demands and affords a remedy for such mutual errors to vindicate the true intentions of the parties.

The doctrine of mutual mistake in its typical applications is expressed in the *Restatement of Contracts* as follows:

> [W]here both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, ... and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties. [*Restatement of Contracts* § 504 (1932)]

See also *Restatement (Second) of Contracts* § 155 (1979). As the commentary to the *Restatement (Second)* explains: "The province of reformation is to make a writing express the agreement that the parties intended it should .... [R]eformation is available when the parties, having reached an agreement and

having then attempted to reduce it to writing, fail to express it correctly in the writing." In addition, the "mistake must be one that is mutual, material, and not induced by negligence." *Santamaria v. Shell Eastern Petroleum Products, Inc.*, 116 *N.J.Eq.* 26, 29 (Ch.1934).

Since the remedy of reformation applies to a written contract, by necessity, there must have been some agreement between the parties prior to that writing to serve as a basis for reformation. See generally Malone, "The Reformation of Writings for Mutual Mistake of Fact," 24 *Geo.L.J.* 613 (1936). However, that "prior agreement need not . . . be complete and certain enough to be a contract." *Restatement (Second) Contracts* § 155, Comment (a). As the commentary accompanying the Restatement explains:

> [I]t is essential for reformation that the parties shall have had the same intention. But it is not necessary that they should have carried out that intention and actually entered into a legal transaction before they made the writing. It is enough that they both intended when the writing was made that its terms should be of a certain character and that this intention was not expressed. Sometimes where parties enter into a written agreement, an oral contract precedes the formation of the writing. . . . Sometimes, however, there is no such oral contract prior to the execution of a written instrument, and it is not essential for reformation that there should have been. All that is necessary is that the parties have come to a complete mutual understanding . . . . [*Restatement Contracts*, § 504, Comment (a)]

The trial court below, in ruling that reformation was not available in this case, proceeded on the assumption that the determination of the presence of a mutual mistake must be made only as of the time that a completed agreement existed between the parties, and not before. The majority makes the same assumption, concluding that at or about the time the parties executed this agreement, lot 2H already appeared in relevant documents. Hence, if there was a mistake regarding the tract's inclusion, it was, by that time, not mutual, since the Diocese, or at least Father Herron, was aware of its presence in the transaction.

The flaw in this analysis lies in its failure to understand that a mutual mistake justifying reformation entails two elements—an agreement on a contract term and an error in expressing that

agreement—and that these can, and usually do, occur sequentially. Thus, the antecedent agreement can take place in the formative stages of a contract before the parties settle other terms.

The majority assumes, as apparently did the trial court, that a mutual mistake can come into existence only when there is a mutual agreement embodied in a completed and enforceable contract. This is perhaps the typical situation in which reformation is available. However, the equitable remedy of reformation is not limited to this obvious or usual class of cases. There is no reason in logic or common sense why a mutual mistake which makes its way into a final completed contract concerning a particular term that was resolved at an early stage in contract negotiations cannot be corrected through reformation. Reformation should be available to correct this kind of error if it would serve to effectuate the true intention of the parties and would not otherwise defeat or distort their intent as to other terms of their contract.

In this case the parties were basically committed to negotiating a land sale as early as November 1968. And at that time they both understood that if such a sale were successfully negotiated, it would include all the legal holdings of the Salvatorians. Thus, the parties, on or about November 25, 1968, reached a mutual understanding on one basic proposition—that any proposed conveyance of property would involve all the Salvatorians' legal land holdings. Throughout the discussions which followed and led to the signing of a contract in February 1969, the parties never wavered from that initial and basic understanding. Yet the writing which expressed that understanding was in error. Therefore, reformation is the appropriate remedy.

The majority notes that terms usually deemed "essential" in a land sale contract, such as total acreage involved, lots included and purchase price, had not yet been established when the parties to this transaction reached their mutual understanding

in November 1968. I agree with the majority that in most circumstances all of these provisions or terms would be essential to the enforceability of a land sale agreement. However, what is an essential term for purposes of reforming a contract on grounds of mutual mistake is another matter. While the remedy of reformation, by definition, cannot be invoked in point of time until there exists a contract to reform and *all* essential terms are agreed upon and reduced to writing, there is no obstacle to its application to a *particular* term which was mutually agreed upon prior to the formation of the final contract. The only requisite to reformation is that the particular, mutually agreed upon term be mistakenly expressed in the final contract.

I am satisfied that the parties in this case reached basic agreement on a particular fundamental term of their contract in November 1968. The undisputed intention of both parties was to effectuate a transfer of all the Salvatorians' legal land holdings, yet the writing which ultimately expressed that intention mistakenly included a lot which the Salvatorians no longer had the legal right to convey. Therefore, reformation is the appropriate remedy under these unusual circumstances.

This was precisely the conclusion reached by the Maine Supreme Court under almost identical circumstances. See *Perron v. Lebel, Me.*, 256 *A.2d* 663 (1969). In that case the parties had arranged the sale of a farm. One lot was to have been excluded from the transaction so that the original owners could retain it in their possession. However, the contract of sale called for the transfer of *all* the farm holdings. The court found the doctrine of mutual mistake applicable and reformed the contract to express the true intention of the parties. *Cf. Scult v. Berger Valley Builders, Inc.*, 76 *N.J.Super.* 124 (Ch.Div.1962), aff'd 82 *N.J.Super.* 378 (App.Div.1964) (real estate contract reformed on mutual mistake grounds to reflect parties' intention that four lots be conveyed after scrivener mistakenly described five tracts); *D'Antoni v. Goff*, 52 *A.D.2d* 973, 383 *N.Y.S.2d* 117 (App.Div.1976) (vendor entitled to recission where parties mutu-

ally believed that 15 acres of land were being conveyed but later learned that 68.3 acres were transferred under the contract).

It is asserted that there was no mutual mistake because Father Herron became aware of the existence of the noncontiguous tract. As pointed out, however, he was not aware that the Salvatorians did not own this parcel. Whether or not both parties suffered under an erroneous conviction that there was no separate tract involved, it is certain that neither party intended that the transaction include land which had already been sold to someone else. Thus, the 1969 agreement, signed on February 26, did not conform to that prior meeting of the minds. Since that conformity was lacking, reformation is an appropriate remedy. *Toth v. Vazquez*, 8 *N.J.Super.* 289 (App.Div.1950). See 13 *Williston On Contracts* § 1547 (1970); *Restatement of Contracts* § 504 (1932).

To reform a written instrument, the party seeking relief must make out its case by "clear and convincing" evidence. See, *e.g.*, *Asbestos Fire Inc. v. Martin Laboratories, Inc.*, 12 *N.J.* 233, 240–241 (1953); *Scult*, 76 *N.J.Super.* at 130. The instant case presents three possible areas of misconception—the prior sale, noncontiguity and the total acreage involved. In my view, the existence of a mutual mistake concerning the prior sale is undeniable. This fact, taken in conjunction with the confusion concerning acreage and contiguity, more than satisfy the "clear and convincing" standard.

Moreover, while a shared misconception is usually mentioned as a requisite to invocation of the reformation remedy for mistake, see *Sardo v. Fidelity & Deposit Co.*, 100 *N.J.Eq.* 332, 335 (E. & A. 1926), it is not necessary that the mistakes be absolutely identical. See *Corbin on Contracts*, § 608 at 672 (1960). In this case, the combination of misconceptions on the part of both parties concerning the ownership, location and acreage of the lots described in the agreement indicated with a reasonable degree of certainty that the inclusion of lot 2H was unintended. It is clear that had the parties not been laboring

under erroneous convictions concerning 2H, they would have omitted that lot number in the written agreement. Therefore, reformation of the 1969 agreement is appropriate to excise the reference to lot 2H so that the contract conforms with the prior intentions of the parties.

The question remains whether this mistake was the product of the Salvatorians' negligence. As a general rule reformation on grounds of mistake will not be granted when the mistake was the result of the complaining party's own negligence. *Riggle v. Skill,* 9 *N.J.Super.* 372, 379 (Ch.Div.1950), aff'd 7 *N.J.* 268 (1951). Relief is thus precluded when the mistake "is wholly caused by the want of that care and diligence in the transaction which should be used by every person of reasonable prudence, and the absence of which would be a violation of a legal duty." *Riggle,* 9 *N.J.Super.* at 379.

The trial court found that the Salvatorians did not conform to the standard of reasonable prudence because they transferred 2H to the Diocese when they had already contracted to convey it to the DiSalvios. However, negligence is bound to accompany every case of mistake. " 'Mistake,' by its very definition, implies some degree of negligence." *Crane v. Bielski,* 15 *N.J.* 342, 348 (1954). The trial court believed that because the Salvatorians made a mistake, they were negligent.

A more appropriate approach would require consideration of whether the Salvatorians' negligence goes beyond mere misjudgment and falls so far below the standard of reasonable prudence that reformation "would be inequitable and fundamentally unjust." *Id.* This is essentially the approach adopted in both Restatements. The *Restatement (Second)* § 157 provides: "A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation . . . unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." See also *Restatement of Contracts* § 508 (1932).

The Salvatorians were aware of the unrecorded 1966 agreement, and perhaps they were careless in failing to bring the agreement to the attention of their attorney. Had they realized that the 1969 agreement included a noncontiguous plot of land, their memories may have been aroused, and perhaps they would have made further inquiries. However, comparison of the 1966 and 1969 agreements would probably have provided little assistance because the 1966 agreement described 2H in terms of metes and bounds, while the 1969 agreement described it in terms of lot and block. The priests were unskilled in reading land descriptions of any kind and had hired an attorney (Gravino) to protect their interests. They naively relied on him to discover any problems. The Salvatorians themselves had failed to appreciate the potential impact of an unrecorded agreement to sell land, which is unfortunate because that knowledge would have been crucial to alerting them of impending problems.

Moreover, the Diocese itself was a partial contributor to this misunderstanding. Father Herron, for one, became aware of the existence of lot 2H, yet he failed to share that information with anyone. The Gilbert appraisal and land survey requisitioned by the Diocese further revealed the existence of a noncontiguous tract and a discrepancy in total acreage. Nevertheless, the Diocese made no attempt to inform the Salvatorians of these apparent problems.

Under these circumstances, while meticulous care would have prevented the inclusion of 2H in the 1969 agreement, it appears that the Salvatorians acted in good faith and with reasonable prudence. The mistaken inclusion resulted from a combination of factors: the unrecorded nature of the 1966 agreement, the lack of a previous survey of all the Retreat House property owned by the Salvatorians and the unclear land references in the appraisals, as well as both parties' lack of awareness concerning the proper lot and block numbers of the property to be conveyed. In my view, the Salvatorians' carelessness does not rise to such a level that reformation "would be inequitable and fundamentally unjust." *Crane v. Bielski*, 15 *N.J.* at 348. See

*Cataldo Construction Co. v. County of Essex*, 110 *N.J.Super.* 414, 422 (Ch.Div.1970).

The remedy of reformation is the fairest way to resolve this controversy and makes the most sense under these circumstances. The majority decision allows the transaction between the Salvatorians and the Diocese to stand, yet this leads to several inequitable results. First, the Diocese will get a windfall of sorts, having paid for only the 150-acre tract on which the Retreat House was situated yet receiving the additional property erroneously included in the contract. The DiSalvios will be denied the land which they had legally contracted to purchase years earlier. However, the majority gives the DiSalvios the right to move against the Salvatorians for "benefit of the bargain" damages. The irony of this approach is that the party so destitute that it was forced to sell all its holdings may end up the big loser. Moreover, the Diocese, which supposedly only entered into this transaction out of its desire to ease the Salvatorians' financial plight, may actually hasten their demise by retaining this noncontiguous tract which was never intended to be transferred in the first place. Reformation leaves all of the parties exactly where they ought to be.

The majority recognizes the inequity of visiting damages upon the Salvatorians and attempts to rectify this inequity by making Gravino, the attorney, a legal scapegoat. It remands the case for further factfinding on the question of whether Gravino committed legal malpractice, requiring him to indemnify the Salvatorians for their losses on the theory that his negligence was the proximate cause of the errors. Even if Gravino is eventually found negligent, this result would impose the entire burden of liability upon one individual, yet still leave in place the erroneous conveyance of lot 2H. It is manifestly unfair to place the entire blame for this incident on Gravino when both the Salvatorians and the Diocese contributed to the error.

I am, therefore, convinced that reformation on grounds of mutual mistake is not only the proper way to resolve this case

but also the most equitable resolution to the conflicts between all parties concerned. The contract of sale between the Salvatorians and the Diocese should be reformed to omit any reference to lot 2H, and the Diocese should relinquish title to that tract.[5]

Justice PASHMAN joins in this opinion.

*For affirmance in part, reversal in part and remandment in part*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, POLLOCK and O'HERN—5.

*Dissenting*—Justices PASHMAN and HANDLER—2.

---

[5] I see no need to adjust the purchase price in this instance because the price agreed upon by the Salvatorians and the Diocese was based on a transfer of 150 acres, which, excluding lot 2H, is essentially what was conveyed. Both appraisals estimated the total acreage to be approximately 150 acres and valued the property at $807,500. The purchase price was $810,000. Moreover, Father Herron testified that the Diocese would have consummated exactly the same deal, even if lot 2H had not been included in the contract.